**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DWAYNE RICHARD JOHNSON, et al., | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | No. 03-2424 |
| | : | |
| GUY A. ANHORN, et al., | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| DANIEL A. ANTONELLI, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 04-146 |
| | : | |
| GUY A. ANHORN, et al., | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

Anita B. Brody, J.                                                January 31 , 2006

**TABLE OF CONTENTS**

I.      Facts........................................................................................................................
        Facts relating to Plaintiff Graham..........................................................................
        Facts relating to Plaintiff Covington......................................................................
        Facts relating to Plaintiffs Antonelli and Crumpton..............................................
        Facts relating to Plaintiff Johnson.........................................................................
II.     Legal Standard.........................................................................................................
III.    Discussion................................................................................................................
        A.      Anhorn's Motion for Summary Judgment...............................................
                1.      Plaintiff Graham's Claims..............................................................
                        a.      The Initial Stop of Graham...............................................
                        b.      The Search of Graham.......................................................
                        c.      Equal Protection Violation as to Graham...........................

1

d.       False Statements on Graham's Affidavit of
Probable Cause...................................................

e.      Qualified Immunity as to Graham......................................
      i.      The Initial Stop.......................................................
      ii.     The Search............................................................
      iii.    The Equal Protection Claim...................................
      iv.    The Affidavit of Probable Cause...........................
      v.     Outstanding Issues of Fact under Forbes.................

2.      Plaintiff Covington's Claims.............................................
      a.      The Initial Stop of Covington............................................
      b.      The Search of Covington's Jacket......................................
      c.      Equal Protection Violation as to Covington.....................
      d.      False Statements on Covington's Affidavit
of Probable Cause....................................................
      e.      Qualified Immunity as to Covington.................................
      i.      The Initial Traffic Stop..........................................
      ii.     The Search of Covington's Jacket........................
      iii.    The Equal Protection Claim...................................
      iv.    The Affidavit of Probable Cause...........................
      v.     Outstanding Issues of Fact Under Forbes...............

3.      Plaintiffs Antonelli and Crumpton's Claims................................
      a.      The Initial Stop of Antonelli's Car............................
      b.      The Search of Antonelli's Car..........................................
      c.      Equal Protection Violation as to Antonelli
and Crumpton.........................................................
      d.      False Statements on Antonelli and Crumpton's
Affidavit of Probable Cause...................................
      e.      Qualified Immunity as to Antonelli and Crumpton............
      i.      The Initial Stop.......................................................
      ii.     The Search of the Car.............................................
      iii.    The Equal Protection Claim...................................
      iv.    The Affidavit of Probable Cause...........................
      v.     Outstanding Issues of Fact Under Forbes...............

4.      Plaintiff Johnson's Claims..............................................
      a.      Procedural Due Process Claim under 42 U.S.C. § 1983.....
      b.      Equal Protection Claim under 42 U.S.C. §
1983....................................................................
      c.      Qualified Immunity as to Johnson.....................................
      d.      Outstanding Issues of Fact Under Forbes...........................

5.      The Plaintiffs' Section 1981, Section 1985, and
State Law Claims....................................................

B.      The Individual Township Officials' Motion for Summary Judgment........

C.      Stemple's Motion for Summary Judgment.................................

2

    1. Section 1983 Claim..........................................................................

    2. Section 1985, Section 1981, Section 1986, and
      State Law Conspiracy Claims...................................................

  D. Township and Police Department's Motion for Summary Judgment........

    1. Section 1983 Claim..........................................................................

    2. Section 1986 Claim..........................................................................

IV. Conclusion...........................................................................................................

Plaintiffs Dwayne Richard Johnson ("Johnson"), Damian A. Graham ("Graham"), Charles Henry Covington ("Covington"), Phenix Crumpton ("Crumpton"), and Daniel A. Antonelli ("Antonelli") bring these related civil rights actions[1] alleging that former Whitemarsh Township[2] Police Sergeant Guy A. Anhorn ("Anhorn"), Whitemarsh Township Police Lieutenant Jesse Stemple ("Stemple"), Whitemarsh Township ("the Township"), the Whitemarsh Township Police Department ("the Police Department"), and Michael A. Zeock, William P. Rimel III, Peter B. Cornog, Anne Younglove, Ronald J. Derosa, and Lawrence Gregan (collectively, "the individual Township officials") violated their constitutional and state law rights.  The plaintiffs are all African American residents of Pennsylvania.  Under 42 U.S.C. §§ 1981 and 1983, plaintiffs Graham, Covington, Crumpton, and Antonelli allege that Anhorn stopped them (in three separate incidents) without reasonable suspicion and on the basis of race, in violation of their rights under the Fourth Amendment, the Fourteenth Amendment's Equal Protection clause, and state law.  Plaintiff Johnson alleges that Anhorn undertook racially motivated official conduct against him, in violation of his Fourth and Fourteenth Amendment rights and state law. The plaintiffs further allege that Stemple and Anhorn conspired to violate their civil rights, in violation of 42 U.S.C. § 1985 and state law.  In addition, they allege that Stemple, Whitemarsh Township, and the Whitemarsh Township Police Department are liable under 42 U.S.C. § 1983 for acquiescing in, promoting, or condoning Anhorn's alleged conduct.  The plaintiffs also seek

---

[1] A complaint was filed in Johnson v. Anhorn, Civil Action No. 03-2424, on April 22, 2003 and amended on March 5, 2004.  On January 15, 2004, a complaint was filed in Antonelli v. Anhorn, Civil Action No. 04-146, alleging identical facts and claims.  The cases were consolidated for discovery purposes and the plaintiffs in both cases have filed joint pleadings in response to the defendants' motions for summary judgment.

[2] Whitemarsh Township is located in Montgomery County, Pennsylvania.

4

recovery under 42 U.S.C. § 1986 against the individual Whitemarsh Township officials, Stemple, and the Township for allegedly neglecting to prevent Stemple and Anhorn's conspiracy to violate the plaintiffs' civil rights.

Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367.  The defendants have moved for summary judgment as to all counts and all plaintiffs.  Anhorn and the individual Township officials move for summary judgment on the basis of qualified immunity as to all claims by all plaintiffs.  For the reasons that follow, I will grant in part and deny in part summary judgment to Anhorn, without prejudice to raise certain claims in a motion in limine before trial.  I will deny summary judgment to the individual Township officials without prejudice to raise in a motion in limine before trial.  I will deny summary judgment to Stemple, the Township, and the Township Police Department, without prejudice to raise certain claims in a motion in limine before trial.  Qualified immunity is denied to Anhorn and to the individual Township officials due to outstanding issues of material fact.

I.    FACTS[3]

The allegations in this case arise primarily from four separate encounters in 2001 and 2002 between the plaintiffs and then-Sergeant Guy Anhorn ("Anhorn").  Because Anhorn's history with the Whitemarsh Township Police Department ("the Police Department") and Whitemarsh Township ("the Township") is relevant to the claims of all plaintiffs, I will begin with these facts.  Then I will discuss each plaintiff's encounter with Anhorn, presenting the

---

[3] I state the facts in the light most favorable to the plaintiffs, the non-moving parties, and take their allegations as true when supported by proper proofs wherever those allegations conflict with those of the defendants.  See Kopec v. Tate, 361 F.3d 772, 775 (3d Cir. 2004).

version of events most favorable to the plaintiff, as supported by evidence in the record.

During all relevant times, Anhorn was one of five sergeants in the approximately thirty-five-member Whitemarsh Township Police Department.  (Johnson Am. Compl. ¶ 10; Hale Rep., Pls.' Resp. to Stemple's Mot. Summ. J. Ex. B at RMA-00005.)  As sergeant, Anhorn was the immediate supervisor of a platoon of officers.  (Anhorn Dep., Township's Ex. D at 14.)  Defendant Jesse Stemple ("Stemple") was the only lieutenant in the Police Department during the time in question and was Anhorn's immediate supervisor.  (Johnson Am. Compl. ¶ 11; Hale Rep., Pls.' Resp. to Stemple Ex. B at RMA-00005.)  As lieutenant, Stemple was second in command and oversaw the day-to-day operations of the Department.  (Hale Rep., Pls.' Resp. to Stemple Ex. B at RMA-00003.)  Stemple's duties also included taking charge of the Department in the Chief of Police's absence, such as the interim period between Chief Richard Zolko's death in July 2002 and the Township's appointment of a new Chief in 2003.  (Id. at RMA-00003, 00010.)

Whitemarsh Township's governing body is its Board of Supervisors ("the Township Board").  During the relevant time period, the Township Board included defendants Michael A. Zeock, William P. Rimel III, Peter B. Cornog, Anne Younglove, and Ronald J. Derosa, and defendant Lawrence Gregan held the position of Township Manager.  (See Johnson Am. Compl. ¶¶ 15-20.)  The Chief of Police is appointed by the Township Board and is accountable to the Township Manager for the performance of the Police Department.  (See Hale Rep., Pls.' Resp. to Stemple Ex. B at RMA-00010.)

At some point during the 1990s, police officers in the Department became concerned about Anhorn's policing practices.  Officers were concerned that Anhorn regularly conducted

6

searches and seizures without reasonable suspicion or probable cause, exhibited racial bias against African Americans, engaged in racial profiling, and falsified Investigative Reports and Affidavits of Probable Cause.  (See generally Hale Rep., Pls.' Resp. to Stemple Ex. B; Keystone Rep., Pls.' Resp. to Stemple Ex. H.)

Some of these concerns were communicated to the Township Board.  In about 1995, then-Officer Donald Bowers ("Bowers") wrote a memorandum to then-Chief Zolko, explaining that Anhorn regularly engaged in illegal search and seizure practices.  (See Dolan Dep., Township's Ex. K at 24-25.)  In about 1999, retired Officer Paul Davis told Township Supervisor Anne Younglove ("Younglove") about Anhorn's practices and recommended that the Township Board take action.  (Id. at 61.)  Township Supervisor Michael Zeock ("Zeock") was a Township Police Officer prior to joining the Township Board in 2001 and had personal knowledge of Anhorn's practices.  (See id. at 159-60; Keenan Dep., Pls.' Resp. to Township's Mot. Summ. J. Ex. K at 137.)  After joining the Board in 2001, Zeock notified the Board about the officers' concerns about Anhorn.  (See Dolan Dep., Township's Ex. K at 159.)

Some of these concerns were also communicated to then-Chief Zolko and Stemple. During the mid-1990s, former Officer Scott McElree ("McElree") spoke with Zolko about the "department chatter" about "concerns about Anhorn with searches and seizures...that certainly it will cause a concern sometime to the department in the future..."  (McElree Dep., Township's Ex. N at 17-21.)  McElree also spoke with Stemple around the same time and told him "[b]asically the same things that I said to Zolko...that there were concerns...and...officers would talk a lot in the locker, roll call...about [Anhorn's] search and seizure issues on the street."  (Id. at 24-25.)  Nonetheless, at least some Township police officers perceived that Anhorn was under

Chief Zolko's and Stemple's protection, and that due to their friendship, Zolko and Stemple were unlikely to take any disciplinary action against Anhorn in response to complaints.  (See id. at 59; Keenan Dep., Pls.' Resp. to Township Ex. K at 108.)

After Zolko's death in 2002, the Township Board commissioned Charles D. Hale ("Hale") of Resource Management Associates, Tinley Park, IL, to conduct a performance assessment of the Police Department.  (See Hale Rep., Pls.' Resp. to Stemple Ex. B at RMA-00003.)  From December 2 until December 12, 2002, Hale interviewed members of the Department, personally observed officers in the field, reviewed internal documents, and conducted a confidential attitude survey of the members of the department.  (Id.)  On December 23, 2002, Hale submitted his findings ("the Hale Report") to the Township Board.  (Id.)  The Hale Report noted several officers' allegations of misconduct by Anhorn, including allegations of racial profiling and deliberate falsification of reports, as well as the existence of an "inner circle" and a "double standard" within the Police Department.[4]  (Id. at RMA-00014-15.)  Although Hale

---

[4] Hale reported, *inter alia,* that:
- "Among a majority of the members of the department, there exists a 'power base' that is narrowly-defined and which serves to either include or exclude members of the department from an 'inner circle'" (Hale Rep. at RMA-00009);
- "Dual standards of conduct seem to exist, and how deviations in policy are dealt with seems to depend upon who you are rather than on what you have done" (id. at RMA-00009); and
- "One of the most frequent complaints voiced by members of the police department during my personal intervenes [*sic*] with them was the conduct of one of the four shift sergeants [*i.e.*, Anhorn].  These same complaints were voiced many times in the employee attitude survey....Among other things, it is alleged that this sergeant: (a) engages in racial profiling; (b) illegally and without justifiable reason stops vehicles occupied by members of minority groups; (c) illegally and unnecessarily runs criminal history checks on drivers who have committed no crime or minor violations; (d) encourages officers to 'embellish' their reports (*i.e.*, falsify

"discovered no indication of brutality, corrupt behavior, improper practices, racial bias, sexual harassment or mistreatment of citizens," Hale recommended that the officers' allegations be brought to the attention of the Township Board and that the next Chief of Police initiate an immediate investigation.  (Id. at RMA-00007, 15.)

After reviewing the Hale Report, the Township Board commissioned David J. MacMain ("MacMain"), an attorney from a Philadelphia law firm, to investigate the allegations about Anhorn's misconduct.  (See Stemple's Reply at 13; MacMain Rep., Pls.' Resp. to Stemple Ex. M at DJM-00001.)  MacMain reviewed the Hale Report, reviewed Anhorn's personnel file, and interviewed the thirty officer-ranked members in the department and Anhorn himself.  (MacMain Rep., Pls.' Resp. to Stemple Ex. M at DJM-00002-8.)  On March 7, 2003, MacMain submitted his report to the Township Board.  (Id. at DJM-00001.)  MacMain did not find that Anhorn had engaged in racial profiling or discrimination, or in falsifying reports.[5]  (Id. at DJM-00009.)

_____

> them); (e) illegally and improperly directs officers to make arrests for offenses not committed in their presence....It is understood that this conduct has been going on for years, and that members of the administration have been aware of it and have done nothing.  Moreover, this sergeant's reputation extends beyond the Whitemarsh Township Police Department.  It is understood that the county prosecutor's office has an unwritten policy to avoid trying any cases involving this sergeant because they would be reluctant to have him testify under oath."  (Id. at RMA-00014-15.)

[5] MacMain stated, *inter alia*:

- "[A]ddressing the incidents of alleged suspect behavior [in interviews with officers], few relayed specific incidents.  Those that did, provided what were general descriptions of incidents which, when I pressed for details or specifics, produced little or none which indicated evidence of misconduct" (MacMain Rep. at DJM-00005);
- "When I dug deeper and questioned [officers] further [about the issue of 'false reports'], it appeared that the complaints were not in the nature of

On March 10, 2003, twenty-four of the thirty Township police officers sent a letter to the Township Board requesting an immediate meeting with the Board to challenge Hale's and particularly MacMain's findings.  (See Mar. 10, 2003 Letter, Pls.' Resp. to Stemple Ex. D.)  The letter stated:

> The results of the [MacMain] investigation were inaccurate and did not reflect the information provided by the police officers and staff.  Officers believe that attempts were made by an administrative police officer [*i.e.*, Stemple] and supervisory police officer [*i.e.*, Anhorn] to intimidate, manipulate, coerce, obstruct and harass officers prior to, during, and following their participation in the investigation.  Several officers sought protection from the township manager [Gregan] but received none.

(Id.)  In a follow-up letter on March 19, 2003, the officers stated that "actions, and inaction, by the township manager have acerbated [*sic*] the problems and contributed to our lack of confidence in the recent investigations and in the administration of the Township."  (See Mar. 19, 2003 Letter, Pls.' Resp. to Stemple Ex. E.)

In April 2003, a group of the officers who signed the March 10, 2003 letter gave a Power Point presentation to the Township Board detailing their complaints.  (See Keystone Rep. at KIN-00004-5, Pls.' Resp. to Stemple Ex. H; see generally Power Point Presentation, Pls.' Resp. to Stemple Ex. F.)  Several police officers gave statements describing Anhorn's illegal policing practices, such as racial profiling, illegal searches and seizures, and falsification of police reports,

---

'false reports' but in the nature of a difference of opinion regarding police style" (id. at DJM-00006-7); and

- One officer "saw no examples of differential treatment shown towards any ethnic or racial group.  The officer did witness incidents in which the officer at issue [Anhorn] was hard on a minority motorist or arrestee and did not give them a break" (id. at DJM-00009).

as well as Anhorn's efforts to intimidate officers who cooperated in MacMain's investigation.[6]

Officers alleged that Stemple had attempted to cover up complaints about Anhorn's misconduct

and generally allowed Anhorn to operate with impunity.[7]  In addition, officers alleged that

---

[6]  For example, the presentation included statements that:

- Anhorn "engages in a practice of observing a vehicle and following it; to my knowledge he usually does not identify a specific violation.  He has Dispatch run the registration and pull up the prior contacts on the CAD system.  If there is a prior for a suspension or inspection violation, he then uses that as probable cause and conduct [*sic*] a vehicle stop.  When necessary I respond to backup this Officer.  During my contacts with the occupants I often hear them ask why they were stopped..."  (Power Point Presentation at Power Point-00001);
- Anhorn told a subordinate officer, "You make the arrest, then you make the probable cause" (id. at Power Point-00009);
- On December 1, 2001, Anhorn conducted what appeared to be a racially motivated vehicle stop (id. at Power Point-00002, 5);
- A "vast majority" of the criminal histories that Anhorn runs during traffic stops are of minorities (id. at Power Point-00012);
- Anhorn was observed conducting racially motivated traffic stops (id. at Power Point-00013);
- Anhorn added unwarranted charges to subordinate officers' criminal complaints (for specific incidents, see id. at Power Point-00002, 9);
- Anhorn regularly stops vehicles without cause and conducts illegal searches of vehicles and persons (id. at Power Point-00003, 16; for specific incidents, see also Power Point-00004, 5, 7, 9, 11, 15, 17);
- Anhorn intentionally made false statements on Investigative Reports (id. at Power Point-00003, 9), an Affidavit of Probable Cause (id. at Power Point-00006), on citations (id. at Power Point-00017),  and in a preliminary hearing (id. at Power Point-00009, 11); and
- Anhorn tried to intimidate or threaten subordinate officers in order to prevent them from disclosing Anhorn's misconduct to MacMain (id. at Power Point-00013, 20, 21, 22).

[7]  Specifically, the officers indicated that Stemple facilitated a cover-up of an officer's complaint about an illegal vehicle search by Anhorn in 1997 (id. at Power Point-00001) and attempted to "influence" a subordinate officer not to report unfavorable conduct by Anhorn to MacMain (id. at Power Point-00018-19).  In addition, it was alleged that "there is a belief around the police department that Sgt. Anhorn can do whatever he wants...and continuously get away with it," as indicated by Anhorn's statement that "I'm God around here and can do anything I want."  (Id. at Power Point-

Township Manager Gregan and the Board had been notified about Anhorn's efforts to intimidate officers cooperating with the MacMain investigation, but Gregan and the Board took no action.[8] (Id. at Power Point-00020, 23.)

In response to the officers' Power Point presentation, the Township Board commissioned the Keystone Intelligence Network ("Keystone") to investigate the officers' allegations. Anhorn was placed on administrative leave during the investigation. (See Anhorn Dep., Township's Ex. D at 170.) The primary purpose of the investigation was to "obtain all relevant information regarding accusations of alleged racial profiling and various other allegations of official misconduct on the part of Sergeant Guy Anhorn, Lieutenant Jesse Stemple and other Township police officers." (Keystone Rep., Pls.' Resp. to Stemple Ex. H at KIN-00004.) On June 27, 2003, Keystone submitted its report to the Board ("the Keystone Report"). (Id. at KIN-00001.) The Keystone Report noted, *inter alia*, that:

- Sixteen officers stated that they have heard Anhorn make "racially inappropriate

_____

00012.)

   [8] Officer Mack stated that he met with defendant Gregan and complained that Anhorn was trying to intimidate him in order to dissuade him from participating in the internal investigations. (Id. at Power Point-00020.) Gregan "made no comments or offers to me that he was going to try and rectify the problem or look into the threats or the actions that Sgt. Anhorn was taking." (Id.) Officer Dolan stated that he had left a voicemail on February 9, 2003, for defendant Gregan, reporting that he had had a confrontation with Sgt. Anhorn in which Anhorn had made a veiled threat to sue him for his participation in the investigation. (Id. at Power Point-00023.) After the officer did not hear back from Gregan for twelve days, he called Gregan twice more. (Id.) On his second call, fifteen days after his first voicemail, the officer reached Gregan on the phone. (Id.) Gregan was "evasive and uncooperative." (Id.) Gregan stated that the Board had been informed of the officer's complaint and had decided that the officer should bring his complaint to MacMain, despite the officer's protest that he had already told MacMain about the incident and MacMain had not shown any interest in investigating it. (Id.)

remarks," such as referring to African Americans as "critters," "crits," "crumbs,"

"porch monkeys," and stating that "anytime you have blacks and whites together

they are up to no good" (id. at KIN-00008–15);

- Eight officers stated that they have observed Anhorn engage in racial profiling (id. at KIN-00016-22);

- Officers made seventeen separate allegations of improper searches and seizures conducted by Anhorn (id. at KIN-00022-51); and

- Five officers made four separate allegations of efforts by Anhorn to intimidate officers acting as internal investigation witnesses (id. at KIN-00056-58).

The Keystone Report also contained allegations by two officers that Stemple had

attempted to influence a witness in the MacMain investigation (id. at KIN-00059-61), as well as

statements by five officers that Stemple had ignored misconduct by Anhorn (id.  at KIN-00062-

66).  Furthermore, the Keystone Report noted statements by officers that

> they were aware that Sergeant Anhorn was a very good friend of Lieutenant Jessie
> [sic] Stemple and the late Chief Zolko and that any report made against Sergeant
> Anhorn would result in no action being taken against Sergeant Anhorn.  The officers
> also indicated that they felt that retaliation might result against them which could
> effectively end their law enforcement careers.

(Id. at KIN-00067.)

Anhorn retired with full benefits in July 2003.  (Anhorn Dep., Township's Ex. D at 169-

70.)  Stemple is currently a Township lieutenant.

### Facts Relating to Plaintiff Damian A. Graham

At approximately 3:30 a.m. on November 4, 2001, plaintiff Damian A. Graham, who is

African American, was the front seat passenger in a Toyota Land Cruiser being driven by a

friend.  (Pls.' Resp. to Anhorn at 5; Graham Dep., Anhorn's Ex. 7 at 31.)  They picked up

Graham's girlfriend from a house on Center Avenue in Whitemarsh Township.  (Graham Dep.,

Anhorn's Ex. 7 at 30-32.)  Adjacent to the house, separated by a gate and a fence, was a gas

station, which was closed for business.  (Id. at 32, 65.)  Shortly after leaving the driveway and

turning onto Germantown Pike, they were stopped by Anhorn.  (Id. at 33.)

Anhorn allegedly stopped the car in response to a radio call by Officer Charles Swan

about a Toyota Land Cruiser leaving a private drive near the Texaco Service Station.[9]  (Anhorn

Dep., Township's Ex. D at 209-12.)  Swan did not communicate that the vehicle had committed

any motor vehicle violations.  (Id. at 209.)  No previous radio calls had reported any crimes in

progress in the particular area.  (Id. at 211.)

Either prior to or shortly after the stop, Anhorn submitted a radio call stating that the

driver of the car was a black male.  (Anhorn Dep., Township's Ex. D at 213.)  Anhorn

approached the driver's side and asked the driver what he was doing there.  (Id. at 215.)  The

driver answered that he was giving his friend a ride to pick up his girlfriend.  (Graham Dep.,

Anhorn's Ex. 7 at 37; Anhorn Dep., Township's Ex. D at 215-16.)  Anhorn looked over at

Graham in the passenger seat and believed he recognized Graham from prior encounters.  (Id. at

---

[9] Swan's deposition does not illuminate the factual basis for his radio call: "Q. With reference to the Damian Graham matter, you actually called in a suspicious vehicle, right?  A. Yes.  Q. And your call was to have somebody check out that vehicle?  A. Yes.  Q. And when you made that call, did you intend that somebody, another officer stop that vehicle to check it out?  A. Yes.  Q. That was based on your observations?  A. Yes."  (See Swan Dep., Township's Ex. E at 51.)  Anhorn cites preliminary hearing testimony by Swan that further explains the basis for Swan's radio call.  (See Anhorn's Memo. of Law at 9 n.16.)  However, Anhorn failed to submit the transcript of this hearing to the court, and Swan's deposition testimony does not reflect the same testimony.  Consequently, I will disregard the preliminary hearing testimony quoted by Anhorn without a citation to the record.

214, 218, 219.)  Anhorn said that he knew who Graham was and asked him, and Graham responded that he was Damian Graham.  (Id. at 218.)

Anhorn ordered Graham out of the car and searched him twice.  During the first search, Anhorn had Graham spread his arms and legs and patted down his outer clothing, but did not find any weapons or contraband.  (Graham Dep., Anhorn's Ex. 7 at 39.)  Then, after Anhorn questioned the driver and ran the driver's license without encountering any problems, Anhorn came back to Graham and told him he wanted to search him again because he knew Graham was a prior burglar and he had a "history" with Graham.  (Id. at 40.)  During the second search, Anhorn reached into the pockets of Graham's jeans and jean jacket, eventually finding less than 3 grams of cocaine and a hotel key in the small coin pocket above the right front pocket of Graham's jeans and over two hundred dollars in the left breast pocket of his jean jacket.  (Id. at 28, 41-47.)

After finding the drugs, Anhorn arrested Graham on drug charges.  (Graham Dep., Anhorn's Ex. 7 at 49-50.)   Anhorn prepared an Affidavit of Probable Cause dated the same night.  (See Aff. of Probable Cause of Nov. 4, 2001, Pls.' Resp. to Anhorn's Mot. Summ. J. Ex. G.)  It includes assertions that, according to Graham's deposition testimony, are false, including that Anhorn patted Graham down "for [the officers'] safety" and found "a long flat pointed object...[a] suspected weapon" and that Anhorn recovered over 3 grams of cocaine.  (See Graham Dep., Anhorn's Ex. 7 at 64-66.)

In subsequent proceedings, Graham filed a motion to suppress the items discovered by Anhorn that night.  (Pls.' Resp. to Anhorn at 7.)  A Montgomery County court of common pleas judge granted the motion, finding that the police had lacked reasonable suspicion to stop the car

15

in which Graham was a passenger.  (Id.; see also Tr. in Commonwealth v. Graham, Pls.' Resp. to Anhorn, Ex. I.)

### *Facts Relating to Plaintiff Charles Henry Covington*

On December 29, 2002, plaintiff Charles Henry Covington, who is African American, lived at home with his parents.  (See Covington Dep., Township's Ex. B at 32-33.)  At approximately 4 a.m. that night, Covington left to pick up some friends.  (Id. at 46.)  Covington had not had any alcohol or marijuana that night.  (Id. at 41.)  Covington had picked up his friends and was driving lawfully on Ridge Pike when he passed Anhorn in his parked car.  (Id. at 46-47; Anhorn Dep., Township's Ex. D at 181.)  Anhorn followed Covington's car and pulled Covington over shortly thereafter.  (Anhorn Dep., Township's Ex. D at 181-82.)

Upon Anhorn's request, Covington was able to produce the car's registration, but not his driver's license.  (Covington Dep., Township's Ex. B at 52.)  Anhorn then ordered Covington out of the car and had him stand by the trunk.  (Anhorn Dep., Township's Ex. D at 187.)  At this point, Covington's jacket was lying on the seat.  (Covington Dep., Township's Ex. B at 54.)  Anhorn opened the car door, took Covington's jacket (which was lying on the seat), and threw it on the trunk.  (Covington Dep., Township's Ex. B at 54, 84.)  Anhorn searched through the pockets of Covington's jacket, eventually finding a clear plastic bag of marijuana.  (Covington Dep., Township's Ex. B at 83-84, 90.)

Anhorn prepared an Affidavit of Probable Cause relating to the incident.  (See Aff. of Probable Cause of Jan. 13, 2003, Pls.' Resp. to Anhorn Ex. T.)  It contains statements that, according to Covington's deposition testimony, are false, including allegations that Covington's seat was reclined "almost horizontal and he was lying back so that he his head was about resting

on the rear seat," that as Anhorn approached the car he observed the right rear passenger attempting to hide Covington's jacket, that Covington "appeared glass-eyed as if here were 'high'," that Anhorn subjected Covington to a sobriety test, and that Anhorn saw a "large clear plastic bag with marijuana sticking out of the [jacket] pocket." (See Covington Dep., Township's Ex. B at 62-64 and 80-84; Dolan Dep., Pls.' Resp. to Anhorn Ex. U at 18-19.)

***Facts Relating to Plaintiffs Daniel A. Antonelli and Phenix Crumpton***

At approximately 12:30 a.m. on October 7, 2002, plaintiff Daniel A. Antonelli, who is African American, was driving his car lawfully when he was stopped by Anhorn on Ridge Pike. (Johnson Am. Compl. ¶ 25; Antonelli Dep., Township's Ex. H at 39-40; Crumpton Dep., Township's Ex. I at 40-41.) Plaintiff Phenix Crumpton, who is African American, was one of the backseat passengers. (Id.) Anhorn approached the car and ordered Crumpton to get out of the car. (Crumpton Dep., Township's Ex. I at 49-50.) Crumpton responded by handing over to Anhorn a marijuana "blunt" he had hidden in his sock and two jars of marijuana he was carrying on his person. (Id. at 50-51.)

Officers Howard Laskey ("Laskey") and Craig Cubbins ("Cubbins") reported to the scene and, at Anhorn's direction, searched the car. (Laskey Dep., Pls.' Resp. to Anhorn Ex. O at 104-5; Cubbins Dep., Pls.' Resp. to Anhorn Ex. P at 18-19.) By reaching up into the area under the driver's seat, they discovered a brown bag wedged there that contained jars of marijuana. (Id.) According to Laskey and Cubbins, this bag was not in plain view. (Id.)

Anhorn prepared an Affidavit of Probable Cause relating to the incident. (See Aff. of Probable Cause of Oct. 7, 2002, Anhorn's Ex. 6.) It contains several allegations that, according to Antonelli's and Crumpton's deposition testimony, are false, including that Anhorn observed

17

Antonelli's car go through a red light, that "there was a strong smell of burning drugs in the car," and that "bottles of marijuana with red and blue caps visible" were found under Antonelli's seat. (See Antonelli Dep., Township's Ex. H at 37-40, 98, 100; Crumpton Dep., Township's Ex. I at 40-41, 87-90, 117.)

That night, Antonelli and Crumpton were arrested and charged with drug possession, criminal conspiracy, corruption of minors, and committing a traffic violation. (See Investigative Report., Anhorn's Ex. 5.) All the charges arising from the incident were either dropped or reversed. (See Antonelli Dep., Township's Ex. H at 105-6; Crumpton Dep., Township's Ex. I at 96-97.)

***Facts Relating to Plaintiff Dwayne Richard Johnson***[10]

At approximately 1:00 p.m. on September 20, 2002, plaintiff Dwayne Richard Johnson, who is African American, was filling his car with gas at an Amoco Service Station in Whitemarsh Township. (Johnson Am. Compl. ¶ 34.) The driver's side door was open approximately a foot and his radio was playing music. (Johnson Dep., Township's Ex. L at 50.) While Johnson was pumping gas, a station attendant, a gray-haired Caucasian man, came out of the station and screamed at Johnson to turn his music down, then went back into the station. (Id. at 50-51.)

Johnson entered the station after the attendant and found the attendant standing behind the counter. (Id. at 52-53.) Johnson said to the attendant, "I'm a paying customer...How dare

---

[10] These facts are largely drawn from Johnson's deposition testimony. The defendants offer as evidence an incident report prepared by Officer Laskey that differs somewhat from Johnson's version of events. (See Incident Rep. of Sept. 20, 2002, Township's Ex. A.) Wherever Laskey's report unfavorably contradicts Johnson's account, I resolve the conflict in favor of Johnson, the non-moving party.

18

you disrespect me like this.  I own two McDonald's restaurants and I don't talk to any of my customers like that."  (Id. at 52.)  The attendant began to make negative comments about Johnson's music, to which Johnson replied that he was a paying customer and that he had the right to listen to whatever type of music he wanted.  (Id. at 53.)  The attendant told him to "get the hell out of here, you nigger."  (Id. at 53.)  A Caucasian woman standing behind the counter next to the attendant said to Johnson, "[G]et out of here before I shoot you."  (Id.)  The attendant told the woman to "go get my gun."  (Id.)

When Johnson began to leave the station, the attendant came out from behind the counter and proceeded to walk over to a white car.  (Id. at 54.)  Fearing that the attendant was carrying out his threat, Johnson went quickly to his car and drove to the Whitemarsh police station, where he reported the incident to the police.  (Id. at 54, 68.)

Approximately three days later, Anhorn called Johnson at home.  (Johnson Dep., Township's Ex. L at 60.)  Anhorn identified himself as Sergeant Anhorn from the Whitemarsh Police and told Johnson that he had spoken to the gas station attendant and heard what Johnson had said to the man.  (Id. at 60.)  Anhorn told Johnson that he was "in violation" and that he could never go to that gas station again, and that if Johnson were "caught on those premises or anywhere near there...[he] would be arrested for terroristic threats and criminal trespass" and other charges.  (Id. at 61.)  Johnson said to Anhorn, "[S]o you're banning me from going back to the gas station based on what they said.  This is the first time you talked to me.  You called me and you're telling me that I can't ever go there."  (Id. at 64.)  Anhorn said, "[T]hat's absolutely right."  (Id.)

Approximately four to seven days later, Anhorn called Johnson at home again.  (Id. at

66.)  According to Johnson, Anhorn said, "Mr. Johnson, this is Sergeant Anhorn...[D]idn't I tell you to stay away from the Amoco[?]...[Y]ou were at the Amoco today."  (Id.)  Johnson denied it.  (Id.)  Anhorn said, "[Y]es, you were...I have information that says you were there, a black Navigator was at the Amoco."  (Id.)  Johnson asked what the license plate of the car was, and Anhorn stated that he did not know.  (Id.)  Johnson never heard from Anhorn again.  (Id.)


## II.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted "if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law."  Kornegay v. Cottingham, 120 F.3d 392, 395 (3d Cir. 1997).  A factual dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In order to survive summary judgment, a plaintiff must make make a showing "sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The court must draw all reasonable inferences in the non-moving party's favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).


## III.   DISCUSSION

Against Anhorn, the plaintiffs bring Count I under 42 U.S.C. § 1983 (alleging violations

20

of the Fourth and Fourteenth Amendments), Count II under 42 U.S.C. § 1981 (alleging violations of equal rights under the law), Count III under 42 U.S.C. § 1985 (alleging that Anhorn conspired to violate their civil rights), Count XV under 42 U.S.C. § 1988, and state law claims under Counts V-X.  Anhorn moves for summary judgment as to all counts and all plaintiffs on the basis of qualified immunity.

Against Stemple, the plaintiffs bring Count III under 42 U.S.C. § 1985 (alleging that Stemple conspired to violate their civil rights), Count V (alleging state law conspiracy), Count XI under 42 U.S.C. § 1983 (alleging supervisory liability for Anhorn's violations of the Fourth and Fourteenth Amendments), Count XII under 42 U.S.C. § 1981 (alleging violations of equal rights under the law), Count XIII under 42 U.S.C. § 1983 (alleging violations by Stemple as Police Department policymaker), Count XIV under 42 U.S.C. § 1986 (alleging neglect to prevent conspiracy to interfere with civil rights), and Count XV under 42 U.S.C. § 1988.  Stemple moves for summary judgment as to all counts and all plaintiffs.

Against the named Township officials, the plaintiffs bring Count XIV under 42 U.S.C. § 1986 and Count XV under 42 U.S.C. § 1988.  The Township officials move for summary judgment as to both counts and all plaintiffs on the basis of qualified immunity.

Against the Township and the Township Police Department, the plaintiffs bring Count IV under 42 U.S.C. § 1983 and Count XIV under 42 U.S.C. § 1986.  The Township and the Township Police Department move for summary judgment as to both counts and all plaintiffs.

### A.    Anhorn's Motion for Summary Judgment

Anhorn moves for summary judgment against all plaintiffs and all claims, arguing that he

is entitled to judgment as a matter of law and qualified immunity from all of the plaintiffs' claims. I will consider his motion as it relates to each plaintiff in turn.

### 1.    Plaintiff Graham's Claims

To recover under 42 U.S.C. § 1983, a plaintiff must establish that a state actor engaged in conduct that deprived him or her of rights, privileges, or immunities secured by the Constitution or laws of the United States. Wilson v. Russo, 212 F.3d 781, 786 (3d Cir. 2000). Graham claims that on November 4, 2001, Anhorn stopped him and searched him without reasonable suspicion in violation of the Fourth Amendment and on the basis of race in violation of the Fourteenth Amendment. Graham additionally claims that Anhorn later knowingly or recklessly submitted false statements in an Affidavit of Probable Cause relating to the incident, in further violation of the Fourth Amendment. Anhorn moves for summary judgment and qualified immunity as to each of Graham's claims. Due to genuine issues of material fact, Anhorn is not entitled to summary judgment or qualified immunity at this stage.

### a.    The Initial Stop of Graham

The Fourth Amendment requires that in order to conduct an investigatory stop, a police officer must have at least articulable and reasonable suspicion based on his experience and observations that criminal activity is afoot. Terry v. Ohio, 392 U.S. 1 (1968).

In the instant case, Graham has put forth sufficient evidence for a reasonable jury to conclude that Anhorn stopped the car in which Graham was riding without articulable and reasonable suspicion of criminal activity, in violation of the Fourth Amendment. Anhorn does not dispute that when he observed the car, it was being driven normally and lawfully. However,

22

Anhorn found it significant that the car had left a driveway behind a closed gas station at 3:30 a.m. Taking the facts as attested by Graham, although the driveway was adjacent to a closed gas station, it is visibly separated from the station by both a metal gate and a wooden fence. Further, according to Graham, after being stopped, the passengers behaved normally and the driver gave a reasonable, truthful explanation for their presence. (See Graham Dep., Anhorn's Ex. 7 at 65.) Thus, under Graham's account of events, the only potentially suspicious facts relating to the car were the late hour and the car's proximity, without access, to a closed business.

These two facts alone are insufficient to establish reasonable suspicion of criminal activity. Mere proximity without access to a closed business is not reasonably suggestive of criminal activity. A late hour, without additional indicia of criminal activity, is sufficient by itself to create reasonable suspicion to justify a Terry stop. Cf. U.S. v. Johnson, 238 F. Supp. 2d 663 (D. Del. 2002) (police had reasonable suspicion justifying Terry stop of occupant of lawfully parked car, where officers observed at relatively late hour of weekday evening a crowd of people congregating around two parked cars in area known for high drug activity, two men fled scene as officers approached, and after officers ordered everyone in and around cars to show their hands, occupant looked surprised and concealed his hands). The mere observation that a car is leaving a private driveway that is adjacent to, but has no access to, a closed gas station is insufficient as a matter of law to provide articulable, reasonable suspicion that the occupants of the car are engaging in criminal activity.

Anhorn does not rest his justification for the stop on his own independent reasonable suspicion. Primarily, he defends his actions based on his reliance upon a radio call allegedly placed by Officer Swan for another officer to check out a particular vehicle. (See Anhorn's

Memo. of Law at 28-29: "Unquestionably, Sgt. Anhorn is entitled to rely upon Swan's request.")

For a stop initiated on the basis of a radio call to be based on reasonable suspicion of criminal

activity, the calling officer him or herself must have had articulable, reasonable suspicion that

criminal activity is afoot.  U.S. v. Hensley, 469 U.S. 221, 232 (1985).  Thus, even if Anhorn were

relying on the radio call, as he alleges, Swan's call must itself be based upon articulable,

reasonable suspicion of criminal activity.  But there is no evidence in the record about what Swan

saw and why he believed his observations gave rise to a reasonable suspicion of criminal

activity.[11]  As a result, Anhorn is not entitled to summary judgment on the issue of whether

Swan's radio call was based on reasonable suspicion of criminal activity and thus justified

Anhorn's Terry stop.[12]

Because Graham has alleged and supported sufficient facts for a jury to reasonably

conclude that Anhorn's stop of the vehicle was unreasonable under the circumstances, Anhorn is

not entitled to summary judgment as to Graham's Fourth Amendment claims arising from the

---

[11] In Swan's deposition, Swan did not provide any further details about the basis for his radio call: "Q. With reference to the Damian Graham matter, you actually called in a suspicious vehicle, right?  A.  Yes.  Q.  And your call was to have somebody check out that vehicle?  A. Yes.  Q.  And when you made that call, did you intend that somebody, another officer stop that vehicle to check it out?  A.  Yes.  Q.  That was based on your observations?  A.  Yes."  (See Swan Dep., Township's Ex. E at 51.)  In Anhorn's Memorandum of Law, he quotes purported preliminary hearing testimony by Swan that provides additional details to justify the radio call. (See Anhorn's Memo. of Law at 9 n.16.)  However, as Anhorn failed to submit the transcript of this hearing to the court and Swan's deposition testimony does not reflect the same testimony, I will disregard the preliminary hearing testimony that Anhorn quotes without citing to the record.

[12] As to Anhorn's right to rely on Swan's information, see *infra* section on qualified immunity as to Graham.

stop.[13]

###### b.      The Search of Graham

If the initial stop were unlawful, everything that flowed from the stop (including the subsequent search of Graham) would also be unlawful under Terry.

Even assuming *arguendo* that Anhorn's initial stop were lawful,[14] Graham could nonetheless survive summary judgment as to the search if a reasonable jury could find that Anhorn's subsequent pat-down of Graham exceeded what was reasonable under the circumstances.  Graham has presented sufficient evidence to establish this Fourth Amendment violation.  The police may seize contraband discovered through a pat-down if the contraband either reasonably feels like a weapon or, alternatively, is immediately apparent as recognizable contraband through "plain feel," and the search stays within the bounds marked by Terry. Minnesota v. Dickerson, 508 U.S. 366 (1993).  Anhorn does not dispute that after an exterior pat-down of Graham's clothing, Anhorn reached into the pocket of Graham's jeans in order to discover the illegal drugs, which amounted to less than three grams of cocaine.  According to Graham, the drugs were located in the small coin pocket above the front right pocket of his jeans. (See Graham Dep. at 28, 41-47.)   If Graham's testimony is believed, a reasonable jury could infer that the drugs were not of a size or shape to be perceived as a weapon, contrary to Anhorn's allegation.  Cf. Pennsylvania v. Mimms, 434 U.S. 106 (1977) (bulge in jacket of driver, who had been lawfully ordered out of automobile following traffic stop, permitted officer's conclusion

---

[13] Graham may be entitled as a matter of law to summary judgment himself on the stop, due to the lack of evidence about the underlying basis or exact content of the radio call.  This was not raised by Graham and will not be addressed.

[14] Or that Anhorn were granted qualified immunity on the initial stop.

that defendant was armed and justified pat-down search of defendant whereby weapon was discovered).

Thus, taking the facts in Graham's favor, Anhorn's search into the coin pocket of Graham's jeans exceeded the scope justified by his suspicions, in violation of the Fourth Amendment.  As a result, even if his initial stop were assumed to be lawful, Anhorn is not entitled to summary judgment as to the lawfulness of his search of Graham's person.

c.     **Equal Protection Violation as to Graham**

Anhorn also seeks summary judgment on Graham's claim that Anhorn impermissibly stopped and searched him on the basis of race.  Selective enforcement of the law on the basis of race violates the Fourteenth Amendment's guarantee of equal protection under the law.  See Whren v. U.S., 517 U.S. 806, 813 (1996).  In Crawford-El v. Britton, 523 U.S. 574 (1998), the Supreme Court held that in order to overcome summary judgment on a § 1983 claim where intent is an element of the claim, the plaintiff must "identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." Id. at 600.  Although the Court shared the D.C. Circuit's concern that "an official's state of mind is 'easy to allege and hard to disprove,'" the Court rejected the D.C. Circuit's requirement of "clear and convincing" evidence of discriminatory intent as overly stringent and inhibiting of legitimate claims.  Id. at 584-5.

Graham offers overwhelming affirmative evidence, including testimony from other police officers, that Anhorn exhibited racial bias towards African Americans in performing his duties as

a police officer in Whitemarsh Township and that he regularly engaged in racial profiling.[15]

(See, e.g., Power Point Presentation, Pls.' Resp. to Stemple Ex. F at Power Point-00002, 5, 12,

13; Keystone Rep., Pls.' Resp. to Stemple Ex. H at KIN-00008-15, 16-22.)  Graham is African

American.  When taken together and considered in the light most favorable to Graham, this

evidence would allow a reasonable jury to infer that Anhorn's stop and search of Graham was

impermissibly motivated by racial bias or discriminatory motive.

Thus, because Graham has satisfied his burden to produce affirmative evidence of

impermissible intent, Anhorn's motion for summary judgment must be denied as to Graham's

Equal Protection claims.

### d.    False Statements on Graham's Affidavit of Probable Cause

Finally, Graham alleges that Anhorn knowingly or recklessly made false statements in the

Affidavit of Probable Cause relating to his arrest.  It is a violation of the Fourth Amendment for

an individual to be arrested on the basis of an Affidavit of Probable Cause that contains

statements that were made knowingly falsely or with reckless disregard for the truth, where those

statements are material or necessary to the finding of probable cause.  Franks v. Delaware, 438

U.S. 154 (1978).  An assertion is made with reckless disregard when "viewing all the evidence,

the affiant must have entertained serious doubts as to the truth of his statements or had obvious

reasons to doubt the accuracy of the information he reported."  Wilson v. Russo, 212 F.3d 781,

788 (3d Cir. 2000).

Here, Graham alleges that Anhorn knowingly or recklessly made false statements in the

---

[15] Anhorn has not raised any hearsay objections to the plaintiffs' citations to the police officers' Power Point Presentation and to the Keystone Report.  Thus, he has waived any objection to my consideration of these documents as evidence in this summary judgment motion.

Affidavit of Probable Cause relating to his arrest.  Specifically, Graham challenges the statements that the driveway was a "private alley [that] had access to [the gas station's] rear door and parked customers' cars" and that Anhorn felt a "long flat pointed object" when he patted down the exterior of Graham's jeans.  (See Aff. of Probable Cause of Nov. 4, 2001, Pls.' Resp. to Anhorn Ex. G; compare with Graham Dep., Anhorn's Ex. 7 at 64-66.)

These allegations were necessary or material to the finding of probable cause in Graham's case.  The allegation about the private driveway's access to the gas station supported the reasonable suspicion underlying the alleged radio call justifying the stop.  Further, Anhorn's allegation that he felt a "long flat pointed object" during the pat-down supported Anhorn's justification for reaching into Graham's pocket, where the illegal drugs were found.  Anhorn's allegation is so clearly in opposition to Graham's version of events that, if a jury believed Graham, they could reasonably infer that Anhorn deliberately lied on the Affidavit.  At the least, a jury could infer that Anhorn had "obvious reasons" to doubt the veracity of his statements in the Affidavit of Probable Cause.

Because a reasonable jury could find that Anhorn's statement on Graham's Affidavit of Probable Cause violated the Fourth Amendment under Franks, Anhorn is not entitled to summary judgment on this claim.

### e.      Qualified Immunity as to Graham

Anhorn asserts qualified immunity against all of Graham's claims.  Qualified immunity is an affirmative defense, and the burden of pleading and proving it rests upon the official invoking it.  Hicks v. Feeney, 850 F.2d 152, 159 (3d Cir. 1988).  A government official performing discretionary functions is entitled to qualified immunity from suit insofar as his conduct "does

not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The test is objective, rather than subjective.  Id. at 818-19.

"[Q]ualified immunity is an objective question to be decided by the court as a matter of law....The jury, however, determines disputed historical facts material to the qualified immunity question."  Carswell, 381 F.3d at 242 (citations omitted).  "[A] decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis."  Curley v. Klem, 298 F.3d 271, 278 (3d Cir. 2002).

The qualified immunity defense involves a two-step analysis.  First, a court must determine whether, taking the facts in the light most favorable to the plaintiff, the defendant official's conduct violated a constitutional right at all.  Saucier v. Katz, 533 U.S. 194, 200-01 (2001).  If it did, the court must then determine whether that right was clearly established at the time of the alleged violation, given the specific facts of the case.  Id.  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Even if the official is mistaken, he or she may be shielded from liability nonetheless if he or she made a "reasonable mistake as to what the law requires."  Carswell v. Borough of Homestead, 381 F.3d 235, 242 (3d Cir. 2004).

Here, Graham has overcome the first step of Saucier (establishing a violation of a constitutional right).  As I explained in my analysis of Anhorn's arguments for summary judgment, Graham has provided sufficient evidence for a reasonable jury to conclude that Anhorn's stop and search of Graham and his subsequent statements on Graham's Affidavit of

29

Probable Cause violated the Fourth Amendment, and that Anhorn's racial profiling violated the Equal Protection Clause of the Fourteenth Amendments.[16]

Proceeding to the second step of <u>Saucier</u>, I must determine whether Anhorn should nonetheless be entitled to qualified immunity because his actions in this context did not violate a clearly established right, either because the law is uncertain or because the officer made a reasonable mistake as to the application of the law.  <u>Saucier</u>, 533 U.S. at 200-01; <u>Carswell</u>, 381 F.3d at 242.  Again, at this stage, I must take all facts in the light most favorable to the plaintiff. <u>Saucier</u>, 533 U.S. at 200-01.

<i>i.      The Initial Stop</i>

For Anhorn's conduct arising from the stop of Graham's car, there are three stages to consider in the analysis of qualified immunity: the stop itself, the pat-down, and the search of Graham's jeans.

Taking the facts in the light most favorable to the plaintiff, Anhorn's decision to stop was based merely on the late hour and the fact that a car pulled out of a private driveway close to, but visibly barred from, a closed gas station.  Given these facts, it would be clearly established under <u>Terry</u> that Anhorn lacked reasonable suspicion to conduct the stop.  Anhorn contends, however, that the driveway from which Graham's car was pulling out had visible access to the closed gas station nearby.  If Anhorn prevails on this factual issue, the law would not be clearly established

---

[16] Anhorn could have established the lawfulness of the stop and thus prevailed as to the stop on the first step of <u>Saucier</u> (establishing that no constitutional violation occurred) if he had presented sufficient evidence that Swan's radio call was based upon articulable, reasonable suspicion.  Although Anhorn argued that Swan had reasonable suspicion (<u>see</u> Anhorn's Memo. of Law at 29), Anhorn failed to provide any such evidence in the record (<u>see</u> <u>supra</u> note 11).  As a result, he has not borne his burden to establish that no constitutional violation occurred as to his <u>Terry</u> stop of Graham.

30

that this was inadequate suspicion to justify a <u>Terry</u> stop.  That is, although <u>Terry</u> is well-established, Anhorn may have reasonably (albeit mistakenly) believed that his alleged observations would be enough to establish reasonable suspicion that the occupants of Graham's car were engaging in criminal activity that may have involved the closed gas station.  As a result, there remain genuine disputes of material fact that preclude qualified immunity relating to the stop (*i.e.*, whether the driveway had visible access to the closed gas station nearby, as Anhorn asserts, or whether it was clearly separated from the gas station by physical barriers, as Graham asserts).[17]

Anhorn argues that if what he personally observed were insufficient to give him the right to make the stop, he would be entitled to qualified immunity nonetheless because he "relied on another officer's radio transmission." (Anhorn's Memo. of Law at 32.)  Anhorn's position appears to be that once another officer makes a radio request to stop a certain vehicle, even if nothing more is said and the circumstances do not indicate the basis for the call, Anhorn would be entitled to qualified immunity for conducting the stop.  This is incorrect.  The law clearly requires that an officer's reliance upon another officer's flyer or bulletin be reasonable under the circumstances.  <u>See Henley</u>, 469 U.S. at 232-233.

The law at the time of the stop gave clear notice to officers like Anhorn that they act at their own peril if they conduct a <u>Terry</u> stop based on a radio call that gives no reason or rationale

---

[17] If Anhorn prevails on his presentation of the facts and is given qualified immunity for the <u>Terry</u> stop due to his reasonably mistaken suspicion of criminal activity, he would also have a reasonable belief that he had a right to pat down Graham and would be entitled to qualified immunity for that issue as well.  He would not yet be entitled to qualified immunity altogether, however, because there are genuinely disputed facts relating to the scope of his search, as I discuss later.

for the stop.  The law became clearly established when the Third Circuit considered the issue of

qualified immunity under similar circumstances in Rogers v. Powell, 120 F.3d 446 (3d Cir.

1997).[18]  In Rogers, the court denied qualified immunity to a police officer who arrested an

individual in reliance on (erroneous) oral statements by fellow officers about the existence of an

arrest warrant.  The court found that it was unreasonable for the arresting officer to rely on

"vague, inconclusive" statements that merely related "rumors" of an arrest warrant, without ever

obtaining a "clear statement...confirming the existence of probable cause for the suspect's arrest."

Id. at 449, 455-56.  The court held that "where a police officer makes an arrest on the basis of

oral statements by fellow officers, an officer will be entitled to qualified immunity...*provided it*

*was objectively reasonable for him to believe, on the basis of the statements*, that probable cause

for the arrest existed."  Id. at 455 (emphasis added; internal citations omitted).

   Based on the evidence presently before the court, it was objectively unreasonable for

Anhorn under the established law of Rogers to believe that a lawful basis for a Terry stop existed

solely on Officer Swan's radio call.  According to Anhorn's deposition testimony, Officer

Swan's call merely stated that a Toyota Land Cruiser was leaving a private drive behind a gas

station.[19]  (See Anhorn Dep., Township's Ex. D at 209-12.)  If these were the sole contents of

_____

   [18] The clearly established status of the law was confirmed more recently in U.S. v.
Coward, 296 F.3d 176 (3d Cir. 2002).  In Coward, an officer made a Terry stop in response to a
radio call "requesting the stop of a green Subaru with the license plate BMS 9857, driven by an
African-American male," where the call did not state the reasons or basis for the request.  Id. at
178.  The court stated, and the government conceded, that "the law at the time of the suppression
hearing...was clear that...reasonable suspicion to justify the stop required the presentation of
evidence by the government that the officer who issued the radio bulletin had reasonable
suspicion..."  Id. at 179-80.  Simply relying on the message was insufficient.

   [19] Anhorn's deposition testimony is currently the only evidence currently before the court
about the content of the radio call (see supra note 11).  In his deposition, Swan confirmed the

Swan's radio call, Swan's radio call failed to provide a "clear statement" or even an articulable

basis for the Graham stop, much like the vague, inconclusive statements in Rogers.  Considered

objectively, a call stating that a car was leaving a driveway behind a gas station would

communicate completely lawful activity that would fail to give rise to reasonable suspicion of

any criminal activity.  Without more, Anhorn's reliance upon the radio call (as it is described in

Anhorn's deposition) as his basis for the stop was unreasonable and he is not entitled to qualified

immunity on this basis.

     If the jury finds the facts as presented by Graham, Anhorn's stop was clearly illegal and

he is not entitled to qualified immunity.  Depending on the content of Swan's radio call, Anhorn

might be entitled qualified immunity, but the call would have to communicate more than what

has been provided to the court at this stage.  If, on the other hand, the jury accepts Anhorn's own

articulable observations as his basis for the stop (*i.e.*, that the private driveway looked as though

it had access to the closed gas station), Anhorn would be entitled to qualified immunity, because

it would be a closer call whether his observations were sufficient to establish articulable,

reasonable suspicion of criminal activity under Terry.  Due to these genuine factual disputes,

Anhorn is not entitled to qualified immunity at this stage.

*ii.*     *The Search*

     Even if Anhorn received qualified immunity on the initial stop itself, the question remains

as to whether Anhorn could have reasonably believed that the scope of his search was lawful.

---

existence of the call, but was not questioned about its precise contents.  No transcript of the radio
call nor of Swan's preliminary hearing testimony about the call has been provided to the court.  I
note that the precise substance of Swan's radio call is disputed, and that at trial further evidence
in Anhorn's favor may be revealed.

This issue cannot be resolved in Anhorn's favor at this stage, due to genuine factual disputes.  It is clearly established that under <u>Terry</u>, a weapons search must be conducted within a scope reasonably calculated to discover a weapon.  <u>See</u> 392 U.S. at 27.  Here, it is genuinely disputed whether Anhorn conducted a second search of Graham's person after failing to discover anything during the first search, whether the cocaine was found in Graham's front right jean pocket or in the small coin pocket above the front right pocket, and whether the contraband seemed by touch to be a potential weapon.  (<u>Compare</u> Anhorn Dep., Township's Ex. D at 219-221. <u>with</u> Graham Dep., Anhorn's Ex. 7 at 28, 40-47.)

If the jury finds the facts as presented by Graham, the extent of Anhorn's search would be illegal.  According to Graham's version, Anhorn failed to discover anything during the first search, then decided to re-search Graham and reached into Graham's small coin pocket, where he found a small amount of drugs.  This second search, if as described by Graham, is not reasonably necessary to secure the officer's safety, given that the first search revealed nothing of concern. Furthermore, the size of Graham's small coin pocket makes it unlikely that an officer would discover a weapon there, or that the amount of drugs found there could be reasonably perceived as a potential weapon.  Thus, taking the facts as alleged by Graham, the scope of Anhorn's search would violate the clearly established bounds of <u>Terry</u> and it would not be objectively reasonable for him to believe that he had the right to make such a search.  If, on the other hand, the jury finds in Anhorn's favor that there was only one pat-down and the contraband seemed by feel to be a possible weapon, Anhorn's search of Graham's coin pocket would be clearly within the scope allowed by <u>Terry</u>.  Therefore, there remains a genuine dispute of fact material to Anhorn's qualified immunity for his search of Graham and Anhorn is not entitled to qualified immunity at

this stage.

### iii.    The Equal Protection Claim

Anhorn does not dispute that it is clearly established that stopping and searching an individual on the basis of race is unlawful, but argues that he is entitled to qualified immunity because Graham has provided insufficient evidence of impermissible intent.  As explained above, because Graham has provided sufficient evidence of intent to go to the jury, Anhorn is not entitled to qualified immunity as to Graham's Equal Protection claim at this stage.

### iv.    The Affidavit of Probable Cause

Similarly, Anhorn does not dispute that it is clearly unlawful to knowingly or recklessly making false statements on an Affidavit of Probable Cause under Franks.  Anhorn's defense is that he was truthful, not that he was reasonably mistaken as to the veracity of his statements.  (See Anhorn's Memo. of Law at 30: "Sgt. Anhorn's Statements in The Affidavit Were Truthful.")  As explained above, because a reasonable jury could credit Graham's assertions and find that Anhorn knowingly or recklessly made false statements on Graham's Affidavit of Probable Cause, Anhorn is not entitled to qualified immunity at this stage.

### v.    Outstanding Issues of Fact Under Forbes

As required by Forbes v. Township of Lower Merion, 313 F.3d 144, 146 (3d Cir. 2002), I specify the facts relevant to qualified immunity that are in dispute:

• Exactly what was said by Swan in his radio bulletin to Anhorn, which is relevant to whether Anhorn's reliance on the bulletin to make the stop was reasonable, thereby entitling him to qualified immunity on the stop;

• Whether the private driveway had access to the gas station's rear door and parked

customers' cars and whether the area had previously been the site of previous late-night

burglaries, thereby providing reasonable suspicion of criminal activity for Officer Swan's

radio call and rendering Anhorn's stop lawful;

•     Whether Anhorn searched Graham only once, whether Anhorn found the contraband in

Graham's small coin pocket, and whether the contraband could have reasonably felt like a

weapon, thereby justifying the scope of Anhorn's search;

•     Whether Anhorn's stop and/or search were motivated by racial bias or discriminatory

motives, which is relevant to the equal protection claim; and

•     Whether, in Graham's Affidavit of Probable Cause, Anhorn stated falsely and with

knowledge of or reckless disregard for his falsity that Graham put his hands in his pockets

when he was ordered out of the car and that Anhorn felt a "long flat pointed object" when

he patted down the exterior of Graham's jeans, thereby violating the Fourth Amendment

under Franks.

Not in dispute are the facts that Anhorn had prior contacts with Graham and that on the

night in question, Graham had a criminal history that included several prior arrests for drug

possession and one prior arrest for burglary.

In sum, Anhorn is not entitled to qualified immunity at this stage, where I must make all

reasonable inferences in Graham's favor.  At trial, a jury will have to resolve a number of factual

disputes relevant to the question of qualified immunity in Graham's case.  If some of the facts

were resolved in Anhorn's favor, Anhorn may be entitled to qualified immunity, because he may

have had reasonable suspicion for the initial stop and subsequent search, he may not have made

the stop based upon an impermissible motive, and his statements on the Affidavit of Probable

Cause may be either truthful or not knowingly or recklessly false.

### 2.    *Plaintiff Covington's Claims*

Covington alleges that Anhorn stopped and searched him on December 29, 2002 without reasonable suspicion or probable cause, in violation of the Fourth Amendment; that Anhorn stopped and searched him on the basis of race, in violation of the Fourteenth Amendment; and that Anhorn later knowingly or recklessly submitted false statements in an Affidavit of Probable Cause relating to the incident, in violation of the Fourth Amendment.  Anhorn seeks summary judgment and qualified immunity as to all of these claims.  Due to genuine disputes of material fact, he is not entitled to qualified immunity at this stage.

### a.    The Initial Stop of Covington

The Fourth Amendment requires that a police officer conducting a traffic stop have at least "articulable and reasonable suspicion that...either the vehicle or an occupant is otherwise subject to seizure for violation of law." Prouse, 440 U.S. at 663.

Covington has provided sufficient evidence for a reasonable jury to conclude that Anhorn stopped his car without articulable and reasonable suspicion of a violation.  Specifically, he offers deposition testimony that he was obeying the speed limit[20] and that his seat was not

---

[20] Anhorn, the Township, the Police Department, and the individual Township Defendants claim that Covington has conceded the fact of his speeding, citing to Covington's deposition.  (Anhorn's Memo. of Law at 5; Township's Reply ¶ 59.)  Their reading of Covington's deposition testimony does not consider it in the light most favorable to Covington, as required at this stage.  Covington testified: "I was looking at the speedometer seeing that I was in the speed limit.  I remember looking at the speedometer before he pulled me over.  Q[:] Did you slow down when you saw that a policeman was behind you?  A[:] No.  I was just doing the speed limit....Q[:] Were you traveling around 50 or 55.  A[:] I'm not sure of the speed.  I just remember that it was the speed limit.  I was looking at the speedometer to make sure I wasn't

reclined to any unusual degree when he was stopped by Anhorn. (See Covington Dep.,

Township's Ex. B at 43, 180.) These are the primary factors upon which Anhorn rests his

decision to stop Covington's car, and Covington's evidence, if believed, would eliminate those

factors.

Nonetheless, the evidence that Covington offers does not necessarily end the inquiry.

The outstanding issue is whether Anhorn could lawfully make a Terry stop of Covington to

investigate criminal activity, independent of the traffic violation. I must consider whether

articulable, reasonable suspicion of criminal activity may be established given the remaining,

undisputed facts, namely the late hour (approximately 4 a.m.) and Anhorn's observation that

Covington and his companions were three youths riding in a 2002 Jaguar. As a matter of law,

Anhorn is not entitled to summary judgment upon these facts. The late hour and the presence of

three youths in the expensive car are insufficient in themselves to establish reasonable suspicion

to justify a Terry stop. It is undisputed that Covington's car had Pennsylvania plates, and that its

appearance was not unusual. There is no evidence in the record that any crimes in the area had

been reported involving youths in a car specifically matching Covington's description. Cf. U.S.

v. Kithcart, 134 F.3d 529 (3d Cir. 1998) (a radio bulletin stating that two black males driving a

black sports car were believed to have committed three robberies in the area a short time earlier

_____

exceeding the limit. Q[:] You believe that the speed limit along there was 50, is that what you
said? Is that correct? A[:] At that time....I believe it's 35 now." (Covington Dep., Township's
Ex. B at 62-64.) The defendants offer evidence that the speed limit was actually 35 miles per
hour on the night in question. (See Behr Aff., Township's Ex. C.) While the defendants are free
to argue at trial that Covington's testimony should be construed as a concession of guilt, it does
not necessarily compel that conclusion. Making all reasonable inferences in Covington's favor, I
find that even if Covington did misremember the posted speed limit three years later, a jury may
nonetheless find credible his claim that he was obeying the speed limit on the night in question.

would not justify arresting any African American men who happened to drive by in any type of black sports car, but a more precise description could justify arrest of individuals matching that description).  A police officer may not lawfully stop any youth driving an expensive car late at night.  Under <u>Terry</u>, additional articulable facts would be necessary to justify a reasonable suspicion of criminal activity.  Because a reasonable jury may thus find that Anhorn lacked reasonable suspicion to conduct the initial traffic stop of Covington's car, Anhorn is not entitled to summary judgment as to the lawfulness of the initial stop under the Fourth Amendment.

### b.      The Search of Covington's Jacket

Assuming *arguendo* that Anhorn's initial stop on the basis of a traffic violation was lawful, the next issue would be whether Anhorn may be entitled to summary judgment as to the lawfulness of his search of Covington's jacket (which was not being worn by Covington).  He is not.

Anhorn's first justification for searching Covington's jacket was that he had reason to believe Covington might pose a danger to him.  Pursuant to a lawful traffic stop, an officer with reasonable suspicion that the car's occupants might be "dangerous and gain immediate control of a weapon" may lawfully conduct a search of the car's passenger compartment.  <u>Michigan v. Long</u>, 463 U.S. 1032, 1049-50 (1983).  <u>See</u> also <u>Knowles v. Iowa</u>, 525 U.S. 113 (1998) (striking down Iowa statute allowing full vehicle searches pursuant to traffic stops, because while potential threat to safety of officer issuing a traffic citation may justify ordering the driver and passengers to exit car, the threat is insufficient, without more, to justify an automobile search).  Furtive hand movements may give an officer reasonable suspicion that a passenger may be dangerous, depending on the surrounding circumstances.  <u>See</u> <u>U.S. v. Moorefield</u>, 111 F.3d 10

(3d Cir. 1997) (occupant of a lawfully parked car's furtive hand movements and refusal to obey officers' orders during traffic stop provided specific, articulable facts to support belief that passenger may be armed, thus warranting pat-down search for weapons).

Anhorn alleges that either prior to or after the stop, he observed Covington's passenger attempting to hand Covington the jacket,[21] which was located on the back seat.   Covington denies this.  (See Covington Dep. at 80-83.)  Therefore, if Covington's version is accepted as true, Anhorn's reasonable suspicion of danger relating to the jacket no longer exists.

As an alternative justification, Anhorn claims that the bag of marijuana was sticking out of the jacket pocket, in plain view.  When an officer observes an object in plain view, no "search" occurs within the meaning of the Fourth Amendment because the owner has shown "no intention to keep [the object] to himself."  Katz v. U.S., 389 U.S. 347, 361 (1967).  Here, Covington offers testimony that the bag of marijuana was not visible, including testimony by another officer at the scene.  (See Covington Dep., Township's Ex. B at 82-84; Dolan Dep., Pls.' Resp. to Anhorn Ex. U at 18-19.)  Therefore, a reasonable jury could find in Covington's favor that no "plain view" justification existed for seizing the marijuana.

Because a reasonable jury could find that Anhorn's search of the jacket was unsupported by either reasonable suspicion or the plain view justification, Anhorn is not entitled to summary judgment as to the lawfulness of his search of Covington's jacket.

---

[21] Anhorn offers contradictory evidence as to when he observed the rear passenger moving the jacket.  In his Affidavit of Probable Cause, Anhorn stated that, after asking Covington to get out of the car, "I was suspicious that the rear passenger was attempting to hand the brown jacket to the driver before the car was stopped...."  (Aff. of Probable Cause, Anhorn's Ex. 4.)   In his deposition, Anhorn stated that after the car was already stopped and he had ordered Covington out of the car, the backseat passenger handed Covington the jacket.  (Anhorn Dep., Township's Ex. D at 190.)

### c.    Equal Protection Violation as to Covington

As I concluded in my discussion of Graham's Equal Protection claim, there is sufficient evidence in the record for a reasonable jury to conclude that Anhorn stopped Covington on the basis of his race (African American), in violation of the Fourteenth Amendment. Thus, Anhorn is not entitled to summary judgment as to Covington's Equal Protection claims.

### d.    False Statements on Covington's Affidavit of Probable Cause

Covington alleges that Anhorn knowingly or recklessly made false statements in the Affidavit of Probable Cause relating to his arrest, in violation of the Fourth Amendment under Franks. Specifically, Covington challenges the veracity of the assertions that he was speeding when Anhorn stopped him, that the rear passenger was visibly attempting to hide Covington's jacket when Anhorn approached the car, and that the bag of marijuana was in plain view in the pocket of his jacket. (See Aff. of Probable Cause of Jan. 13, 2003, Anhorn's Ex. 4; Covington Dep., Township's Ex. B at 62-64, 80-84; Dolan Dep., Pls.' Resp to Anhorn Ex. U at 18-19.)

These facts were necessary or material to the finding of probable cause in Covington's case, because they established the legal basis for stopping Covington's car and for searching Covington's jacket, where the drugs were eventually found. Covington's version of the facts, if believed, differs sufficiently from Anhorn's to give rise to a reasonable inference that Anhorn knowingly or recklessly made false statements on the Affidavit of Probable Cause.

Thus, as with Graham, because a reasonable jury could find that Anhorn's statements on Covington's Affidavit of Probable Cause violated the Fourth Amendment under Franks, I will deny Anhorn summary judgment as to this claim.

### e.    Qualified Immunity as to Covington

41

Because Covington has presented sufficient evidence for a reasonable jury to find that Anhorn violated his Fourth and Fourteenth Amendment rights, Covington has overcome the first step of <u>Saucier</u>'s qualified immunity analysis (whether the plaintiff has alleged a constitutional violation at all).  Now I must determine whether Anhorn may nonetheless be entitled to qualified immunity under the second step of <u>Saucier</u>.  Anhorn may be entitled to qualified immunity under this step of <u>Saucier</u> if the law was not clearly established or if he made an objectively reasonable mistake as to what the law requires in the given factual context.  <u>Saucier</u>, 533 U.S. at 200-01.  Taking the facts in the light most favorable to Covington, however, Anhorn is not entitled to qualified immunity.

*i.        The Initial Traffic Stop*

If the stop were, in fact, pursuant to a traffic violation, then there is no issue as to the legality of the stop and Anhorn receives qualified immunity at the first step of <u>Saucier</u> (whether a constitutional violation existed at all).

Accepting Covington's testimony that he was not speeding, the only facts remaining to justify Anhorn's stop as a <u>Terry</u> stop are the late hour, the youth of the car's occupants, and the expensive model and make of the car.  It is a matter of well-established law under <u>Terry</u> that articulable facts about the circumstances must add up to reasonable suspicion.  The question thus becomes whether a reasonable official in Anhorn's position could have believed that he had lawful justification for stopping a car under the circumstances as Covington states them.  The answer is no.  The late hour, the youthful age of a car's occupants, and the expensiveness of a car are insufficient as a matter of clearly established law to establish reasonable suspicion for a <u>Terry</u> stop.  Thus, a reasonable official in Anhorn's position could not have believed that his actions,

under the facts asserted by Covington, were lawful.   As a result, Anhorn is not entitled to

qualified immunity as to the lawfulness of the initial traffic stop at this stage.

ii.        *The Search of Covington's Jacket*

If the initial stop were found to be unlawful, Anhorn's subsequent actions, including his

search of Covington's jacket, would also be unlawful under Terry.

If the stop were found to be a lawful traffic stop, the next question would be whether

Anhorn should be entitled to qualified immunity as to his search of Covington's jacket (which

was in the car, but not being worn by Covington, when Anhorn approached the car).  When

taking the facts in the light most favorable to Covington, Anhorn is not entitled to qualified

immunity.

It is well-established that in order to justify conducting a vehicle search pursuant to a

traffic stop, an officer must have at least reasonable suspicion that the car's occupants might be

armed and dangerous.  Long, 463 U.S. at 1049-50; Knowles, 525 U.S. at 117-19.  Anhorn alleges

that he observed the rear passenger in Covington's car attempting to hand Covington the jacket

either before or after he stopped the car, and that the plastic bag of marijuana was in plain view

sticking out of a pocket.  Under Covington's version of events, as supported by deposition

testimony, Anhorn did not and could not have observed any furtive movements relating to the

jacket.  (See Covington Dep., Township's Ex. B at 82-84; Dolan Dep., Pls.' Resp. to Anhorn Ex.

U at 15-16.)  Furthermore, according to Covington, the plastic bag of marijuana was not visible

in the jacket's pocket.  (See id.)  Without at least one of these key facts in his favor, Anhorn lacks

a articulable, reasonable basis to render his search and seizure of the bag of marijuana lawful.

On the other hand, if at trial the jury finds either that Anhorn observed furtive movements

relating to the jacket or that the plastic bag of marijuana was visible, a reasonable official would be entitled to believe that he had sufficient reason to search the jacket, either due to reasonable suspicion of dangerousness or plain view of contraband, and Anhorn would be entitled to qualified immunity as to the search.

Taking the facts in the light most favorable to Covington, however, Anhorn is not entitled to qualified immunity on the lawfulness of his search of Covington's jacket at this stage.

<em>iii.    The Equal Protection Claim</em>

For the same reasons stated in my analysis of Graham's claim, Anhorn is not entitled to qualified immunity as to Covington's Equal Protection claim.

<em>iv.    The Affidavit of Probable Cause</em>

As with Graham's claim, Anhorn does not dispute that the unlawfulness of knowingly or recklessly making false statements on an Affidavit of Probable Cause is clearly established under Franks.  Anhorn's defense is truth, not reasonable mistake.  (See Anhorn's Memo. of Law at 21: "Sgt. Anhorn's Statements In The Affidavit Were Truthful.")  As explained above, because a reasonable jury could find that Anhorn knowingly or recklessly made false statements on Covington's Affidavit of Probable Cause, Anhorn is not entitled to qualified immunity as to the claim that Anhorn made false statements on the Affidavit of Probable Cause.

<em>v.    Outstanding Issues of Fact Under Forbes</em>

Under Forbes, supra, the following facts are material to qualified immunity and subject to genuine dispute:

• Whether Covington was speeding or reasonably appeared to be speeding when Anhorn stopped him, thereby giving Anhorn probable cause for the traffic stop or

44

the reasonableness required for qualified immunity;

• Whether the rear passenger attempted to hand Covington the jacket in Anhorn's presence, thereby giving Anhorn reasonable suspicion to search it;

• Whether the plastic bag of marijuana was in plain view, thereby giving Anhorn a lawful basis to seize it;

• Whether Anhorn's stop and/or search were motivated by racial bias or discriminatory motives, which is relevant to the Equal Protection claim; and

• Whether, in Covington's Affidavit of Probable Cause, Anhorn stated falsely and with knowledge of or reckless disregard for his falsity that Covington was speeding, that the rear passenger was attempting to hide Covington's jacket, and that the bag of marijuana was in plain view.

In sum, Anhorn is not entitled to qualified immunity at this stage, where I must make all reasonable inferences in Covington's favor.  As with Graham, at trial a jury will have to resolve a number of factual disputes relevant to the question of qualified immunity in Covington's case. If some of the facts were resolved in Anhorn's favor, Anhorn could be entitled to qualified immunity, because he may have had probable cause that a traffic violation had occurred for the initial stop, he may have had reasonable suspicion and/or "plain view" justification for the subsequent search, he may not have made the stop based upon an impermissible motive, and his statements on the Affidavit of Probable Cause may have been either truthful or not knowingly or recklessly false.

### 3.    *Plaintiffs Antonelli and Crumpton's Claims*

45

Antonelli and Crumpton allege that on October 7, 2002, Anhorn stopped their car without reasonable suspicion of a traffic violation and unreasonably searched the car, in violation of the Fourth Amendment;[22] that Anhorn took these actions on the basis of race, in violation of the Fourteenth Amendment; and that Anhorn later knowingly or recklessly submitted false statements in the Affidavit of Probable Cause relating to the incident, in further violation of the Fourth Amendment.  Anhorn seeks summary judgment as to all of these claims.

### a.     The Initial Stop of Antonelli's Car

As noted previously, the Fourth Amendment requires that in order to effect a lawful traffic stop, an officer must have at least reasonable suspicion that a driver has committed a traffic or vehicle code violation.  Prouse, 440 U.S. at 663.  A stop of a car is a "seizure" of all of the persons within the car, and thus implicates the Fourth Amendment rights of the driver and passengers.  See, e.g., U.S. v. Grant, 349 F.3d 192 (5th Cir. 2003); U.S. v. Ameling, 328 F.3d 443 (8th Cir. 2003); U.S. v. Sowers, 136 F.3d 24 (1st Cir. 1998).  Thus, the traffic stop of Antonelli's car implicates both Antonelli's and Crumpton's Fourth Amendment right to be free from unreasonable searches and seizures.

A reasonable jury could find in favor of the plaintiffs that Anhorn unreasonably stopped Antonelli's car without suspicion of a violation.  In the instant case, Anhorn offers only one justification for his stop: that Antonelli and Crumpton ran a red light in his presence.  (See

----

[22] Crumpton does not challenge the legality of Anhorn's ordering him out of the car or, once out of the car, his voluntary decision to hand over to Anhorn a marijuana "blunt" he had hidden in his sock and two jars of marijuana he was carrying on his person.  (See Pls.' Resp. to Anhorn at 8-19, 24.)  Therefore, Crumpton's claims are limited to the lawfulness of the initial stop, the veracity of the statements on the Affidavit of Probable Cause relating to this incident, and Anhorn's motives in conducting the stop.  As will be discussed later, as a mere passenger, Crumpton does not have a viable claim regarding the lawfulness of the search.

Anhorn's Memo. of Law at 23.)  Antonelli and Crumpton have provided deposition testimony

that they did not do so.  (See Antonelli Dep., Township's Ex. H at 39-40; Crumpton Dep.,

Township's Ex. I at 40-41.)  If a reasonable jury found that no such violation occurred, Anhorn's

sole justification for the traffic stop would disappear.  Due to this factual dispute, Anhorn is not

entitled to summary judgment on the lawfulness of his initial stop.

### b.        The Search of Antonelli's Car

After Anhorn ordered Crumpton out of the car, Crumpton handed marijuana over to

Anhorn and Anhorn placed him under arrest.  Then Anhorn ordered Antonelli and the other

passengers out of the car and ordered a search of the car.  Assuming *arguendo* that the initial stop

were lawful, the next issue would be whether Anhorn is entitled to summary judgment as to the

lawfulness of the search, which ultimately uncovered a bag of marijuana owned by Antonelli and

Crumpton.[23]

As to Crumpton, the search of Antonelli's car does not implicate any of his

constitutionally protected rights.  Although Crumpton asserts a property interest in the bag of

marijuana that was eventually seized, he has no property interest in the car where the bag was

allegedly found.  "Passengers *qua* passengers" generally have no expectation of privacy

regarding the interior of a car in which they are riding.  Rakas v. Illinois, 439 U.S. 128, 148-49

(1978).  See also Gov't of the Virgin Islands v. Williams, 739 F.2d 936, 939 (3d Cir. 1984) (non-

---

[23] I note that no constitutional issues are raised by the events leading up to the search of
the car, assuming the initial stop were lawful.  There is no dispute that Anhorn lawfully ordered
Crumpton out of the car.  Pursuant to a lawful traffic stop, a police officer may lawfully order the
driver out of the car without any particularized suspicion, Mimms, 434 U.S. at 109-11, as well as
any passengers, Maryland v. Wilson, 519 U.S. 408, 414-15 (1997).  Furthermore, Crumpton does
not contest the voluntariness of his giving the marijuana to Anhorn.  Nor does Crumpton dispute
that this action gave Anhorn probable cause to arrest him.

owner passenger had no legitimate expectation of privacy in torn seat and ripped ceiling of car, where illegal firearms were found).  "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."  Rakas, 439 U.S. at 134.  Therefore, the search of Antonelli's car, even if it were unreasonable, does not give rise to any Fourth Amendment claim as to Crumpton.  The Fourth Amendment's limits regarding the search apply, if at all, only to Antonelli, the owner of the car.

As to Antonelli, owners of cars generally have a legitimate expectation of privacy in the interior of their car.  See Williams, 739 F.2d at 939 ("Because [defendant] owned the car [whose torn seat and ripped ceiling were searched pursuant to probable cause], we believe that he satisfied the 'legitimate expectation of privacy' requirement of successful Fourth Amendment claims"); U.S. v. Jefferson, 925 F.2d 1242 (10th Cir. 1991) (owner-passenger "alone retained a possessory interest" in the car and thus could challenge the search of lawfully stopped vehicle).  Therefore, as the owner and driver of the car, Antonelli normally has a protected privacy interest in being free from unreasonable searches of his car.

However, a car owner-driver does not retain this protected privacy interest where a passenger is lawfully arrested and the car is searched incident to the passenger's arrest.  Because the search is initiated pursuant to the arrest of another, the search does not implicate the owner-driver's Fourth Amendment rights, only the privacy rights (if any) of the arrestee-passenger.  As already noted, however, a passenger *qua* passenger has no privacy interest in another person's car.  Thus, the search of the car would not violate the passenger's Fourth Amendment rights, no matter how extensive the search's scope.  In a criminal context, contraband seized during such a

48

search would thus be admissible against the passenger.  It would also be admissible against the owner of the car, because he would have no Fourth Amendment objection to a search incident to the arrest of another.  Fourth Amendment rights are personal, and may not be invoked on behalf of another.  Rakas, 439 U.S. at 133-34.

It may be questioned whether the existence of grounds for suppression should be a distinct inquiry from the existence of a constitutional violation under § 1983.  Arguably, the unreasonable execution of a search or seizure could be actionable under § 1983, even if the underlying search or seizure were based upon probable cause or a warrant and thus no suppressable violation would have occurred.  See, e.g., Peterson v. Jensen, 371 F.3d 1199 (10th Cir. 2004) (although officers held valid warrant to search house based on activities by former residents, if officers continued to search premises after confirming that targets of search no longer resided there, the search would then violate the clearly established Fourth Amendment rights of the new residents).  Under this theory, Antonelli's own right to privacy, flowing from the ownership and possession of his car, would give rise to a claim under § 1983 that the search went beyond the scope authorized by Crumpton's arrest, and thus trespassed into the area protected by Antonelli's Fourth Amendment rights.

The law points to the better ruling, however, that there must be a bright-line rule for police officers to follow regarding vehicle searches incident to a custodial arrest.  Belton, 453 U.S. at 459-60; Thornton v. U.S., 541 U.S. 615, 622-23 (2004) ("The need for a clear rule, readily understood by police officers and not depending on differing estimates of what items were or were not within reach of an arrestee at any particular moment, justifies the sort of generalization which Belton enunciated").  Therefore, once a police officer's search is

appropriate under suppression rules, an officer should not have to be concerned about a later §

1983 attack on the same search.  Therefore, if the initial stop were lawful, Anhorn would be

entitled to summary judgment as to the lawfulness of the subsequent search.[24]

### c. Equal Protection Violation as to Antonelli and Crumpton

As discussed in my analysis of Graham's and Covington's Equal Protection claims, there

is sufficient evidence in the record for a reasonable jury to conclude that Anhorn stopped

Antonelli and Crumpton on the basis of their race (African American), in violation of the

Fourteenth Amendment.  Thus, Anhorn is not entitled to summary judgment as to Antonelli's

and Crumpton's Equal Protection claims.

### d. False Statements on Antonelli and Crumpton's Affidavit of Probable Cause

---

[24] It is disputed whether there was a "strong smell of burning drugs" coming from the car
when Anhorn approached the car.  (See Antonelli Dep., Township's Ex. H at 98; Crumpton Dep.,
Township's Ex. I at 117.)  If Anhorn were believed, he could establish probable cause to search
the entire car, including the car seats.  The smell of raw marijuana emanating from a vehicle may
legitimately contribute to probable cause to search the vehicle without a warrant.  U.S. v. Johns,
469 U.S. 478, 482-83 (1985) (upholding probable cause for a warrantless search of containers
within a vehicle, where events surrounding rendezvous of aircraft and pickup trucks at isolated
desert airstrip indicated smuggling activity and customs officers on the ground detected the
distinct odor of marijuana upon coming closer to the trucks).

Here, the alleged "strong smell of burning" marijuana emanating from the car would have
given Anhorn probable cause to believe that there was marijuana hidden inside the car, as an
alternative basis for the search.  If the bag of marijuana was located on the floor beneath the
driver's seat, as Anhorn alleges, the bag would be an obvious potential receptacle for the
marijuana sought and thus would be clearly within the scope afforded by the probable cause in
this case.  Even if the bag of marijuana were wedged up inside the driver's seat, as Antonelli
alleges, the search of the inside of the car seat would still be justified as "part of the vehicle that
might contain the object of the search."  See U.S. v. Ross, 456 U.S. 798, 821 (1982).  Therefore,
if Anhorn did in fact smell a "strong smell of burning drugs" emanating from the car, his search
of the car, including the driver's seat, would be lawful as a warrantless search based upon
probable cause.

50

Antonelli and Crumpton further allege that Anhorn knowingly or recklessly made false statements in the Affidavit of Probable Cause relating to their arrests (see Aff. of Probable Cause of Oct. 7, 2002, Anhorn's Ex. 6), in violation of the Fourth Amendment. Franks, 438 U.S. 154. Specifically, Antonelli and Crumpton challenge the assertions that they ran a red light in Anhorn's presence.[25]  (See Crumpton Dep., Township's Ex. I at 40-41; Antonelli Dep., Township's Ex. H at 37-40.)

The existence of a red light violation would be necessary to a finding of probable cause in Antonelli's and Crumpton's cases, because it would establish the legality of the traffic stop upon

_____

[25] Anhorn claims that "Antonelli concedes that he was found guilty of running a red light," without any citation to the record.  (See Anhorn's Memo. of Law at 24.)

First, it must be noted that Anhorn does not argue that collateral estoppel should apply.  (See id.)  Rather, he appears to offer this purported concession as further evidence that Antonelli did in fact run the red light on the night in question.  But upon independent review of Antonelli's deposition, no such concession is found.  (See Antonelli Dep., Township's Ex. H at 105-6: "Q[:] What happened with the charges that you pled guilty to?  A[:] My conviction was reversed.  Q[:] On both charges? A[:] I think the only charge was a minor traffic offense.  Q[:] So running the red light – A[:] I'm not sure if it was both or what.  I honestly don't know.  Q[:] Do you know if you have any points on your license from running the red light?  A[:] I don't know...Q[:] Did you have to pay any fine for the traffic violation of running a red light?  A[:] I haven't, but I've been getting hassled by a collection agency.  I'm not sure if that's what it's about or what.  I stopped answering.  I don't know.")  In Antonelli's favor, I reasonably interpret his testimony to be that to his knowledge, he did not sustain a conviction for running a red light.

Furthermore, even if Anhorn were supposed to have made a collateral estoppel argument, it would not prevail at this stage.  In order to collaterally estop Antonelli, he would have to provide evidence that Antonelli had a full and fair opportunity to litigate the red light violation, such as a transcript of the state court proceedings.  See DiRocco v. Anderson, 1986 WL 12444 at *5 (E.D. Pa. Nov. 3, 1986) (refusing to apply collateral estoppel given dearth of evidence concerning whether the plaintiff had a full and fair opportunity to litigate the traffic charges filed against him); Kauffman v. Moss, 420 F.2d 1270, 1274-75 (3d Cir. 1970) ("it is usually necessary for district court to examine record of prior trial" before applying collateral estoppel to dismiss a complaint).  As to Crumpton, Anhorn would also need to establish that Antonelli's litigation of the red light violation should be applied to estop Crumpton as well.  Anhorn has offered no evidence to estop either Antonelli or Crumpton, so any collateral estoppel argument he is advancing must be rejected.

51

which their arrests were predicated.  Antonelli and Crumpton's flat denial of this allegation, if believed, could give rise to a reasonable inference that Anhorn knowingly or recklessly made false statements on Antonelli and Crumpton's Affidavit of Probable Cause.

Thus, as with Graham and Covington, because a reasonable jury could find that Anhorn's statements on Antonelli and Crumpton's Affidavit of Probable Cause violated the Fourth Amendment under <u>Franks</u>, I will deny Anhorn summary judgment as to this claim.

### e.      Qualified Immunity as to Antonelli and Crumpton

Because Antonelli and Crumpton have provided sufficient evidence for a reasonable jury to find that Anhorn stopped their car without cause, in violation of the Fourth Amendment, and stopped them on the basis of race, in violation of the Fourteenth Amendment, they have passed the first step of the <u>Saucier</u> qualified immunity analysis (whether a constitutional violation has been established at all).

Now I turn to the second step of <u>Saucier</u>, whether Anhorn should nonetheless be entitled to qualified immunity because his conduct, even when taken in the light most favorable to Antonelli and Crumpton, fails to violate a clearly established right about which a reasonable officer would have known or could have made a reasonable mistake.  At this stage, I find that Anhorn is not entitled to qualified immunity.

#### i.      The Initial Stop

Anhorn rests his entire argument about the lawfulness of the traffic stop on the allegation that Antonelli ran a red light in his presence.  (<u>See</u> Anhorn's Memo. of Law at 23-24.)  Because this alleged red light violation is genuinely disputed and Anhorn has provided no other factual basis for immunity, he is not entitled to qualified immunity as to the lawfulness of his initial stop

at this stage.

### ii.     The Search of the Car

If the initial stop were lawful, Anhorn would be entitled to qualified immunity on the

search.  Under the first step of the Saucier analysis, there are no open issues of fact as to whether

the search of the car is legal, because search of the car did not violate any Fourth Amendment

rights as to either Antonelli or Crumpton.  Therefore, Anhorn would receive qualified immunity

as to the search should the initial stop be upheld.

### iii.    The Equal Protection Claim

For the same reasons as in Graham's and Covington's claims, Anhorn is not entitled to

qualified immunity as to Antonelli's and Crumpton's Equal Protection claims.

### iv.     The Affidavit of Probable Cause

As with Graham's and Covington's claims, Anhorn does not dispute that the

unlawfulness of knowingly or recklessly making false statements on an Affidavit of Probable

Cause is clearly established under Franks.  Anhorn's defense is truth, not reasonable mistake.

(See Anhorn's Memo. of Law at 26: "Sgt. Anhorn's Statements In The Affidavit Were

Truthful.")  Because a reasonable jury could find that Anhorn knowingly or recklessly made false

statements on Antonelli and Crumpton's Affidavit of Probable Cause, Anhorn is not entitled to

qualified immunity at this stage.

### v.      Outstanding Issues of Fact Under Forbes

The facts that are material to qualified immunity and subject to genuine dispute under

Forbes, 313 F.3d at 146, are:

   •       Whether Antonelli ran a red light in Anhorn's presence, thereby justifying

Anhorn's initial traffic stop;

•        Whether Anhorn's stop and search of the car were motivated by racial bias or discriminatory motives; and

•        Whether, in the Affidavit of Probable Cause, Anhorn falsely stated with knowledge of or reckless disregard of his falsity that Antonelli was speeding when he stopped him.

It is undisputed that after Anhorn stopped the car and ordered Crumpton out of the car, Crumpton voluntarily gave to Anhorn a marijuana blunt and two jars of marijuana he had been carrying on his person, and that Crumpton was initially placed under arrest based on this action. (See Crumpton Dep., Township's Ex. I at 49-51.)

In sum, Anhorn is not entitled to qualified immunity at this stage, where I must make all reasonable inferences in Antonelli's and Crumpton's favor.  As with Graham and Covington, at trial a jury will have to resolve a number of factual disputes relevant to the question of qualified immunity in this case.  If the factual disputes relating to the traffic violation, the motivation for the stop, and the Affidavit of Probable Cause are resolved in Anhorn's favor, Anhorn will be entitled to qualified immunity.

### 4.      *Plaintiff Johnson's Claims*

Johnson argues that his Fourteenth Amendment right to Equal Protection was violated when in September 2002, in response to Johnson's filing of a criminal complaint at the Whitemarsh Police Department, Anhorn ordered Johnson not to return to the site of the incident underlying the complaint and threatened him with arrest should he do so, allegedly on the basis

of race.

### a.     Procedural Due Process Claim under 42 U.S.C. § 1983

In Count I of his Amended Complaint, Johnson alleges that Anhorn's conduct violated, *inter alia*, his due process rights.  (See Johnson Am. Compl. ¶¶ 76, 85.)   Anhorn is entitled to summary judgment as to Johnson's procedural due process claim in Count I, due to an absence of any genuine disputes of material fact.

Anhorn argues that he is entitled to summary judgment as to the alleged procedural due process violation because Anhorn had no legal duty to protect Johnson from the gas station attendant or the attendant's companion, and therefore, his conduct did not violate any right protected by procedural due process.  (See Anhorn's Memo. of Law at 12-14.)  In Johnson's response, Johnson presents legal arguments relating to his Equal Protection claim under 42 U.S.C. § 1983, but fails to address Anhorn's challenge to his procedural due process claim.  (See Pls.' Sur-Reply to Anhorn at 5-8.)

Because Anhorn has satisfied his summary judgment burden and Johnson has failed to respond, Anhorn is entitled to summary judgment as to Johnson's procedural due process claim in Count I of Johnson's amended complaint.

### b.     Equal Protection Claim under 42 U.S.C. § 1983

To establish an Equal Protection violation, Johnson must show that a discriminatory purpose was a motivating factor in Anhorn's exercise of his discretionary authority.  See Village of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252 (1977).[26]   The fact that there

---

[26]  I decline to adopt Anhorn's suggestion that Johnson be required to demonstrate that he was treated differently compared with others similarly situated.  (See Anhorn's Memo. of Law at 15.)  This formulation of Equal Protection law is appropriate for racial

may have been no unlawful search or seizure, and thus no Fourth Amendment violation, is irrelevant to a claim of racially motivated police conduct.  Carrasca v. Pomeroy, 313 F.3d 828, 836 (3d Cir. 2002).  In Carrasca, the plaintiffs alleged that state park officials had arrested them for swimming after hours on the basis of their Hispanic race, unlike similarly situated Caucasian swimmers.  The Third Circuit reversed a grant of summary judgment in favor of the defendants as to the plaintiffs' Equal Protection claims, noting that "[t]he fact that there was no Fourth Amendment violation does not mean that one was not discriminatorily selected for enforcement of a law....Plaintiffs' equal protection claims require a wholly separate analysis..." Id. at 836.

Taking the facts in the light most favorable to Johnson, who is African American, he was the victim of a racially motivated threat of deadly assault and was not the aggressor of the

---

profiling cases, where an individual claims that he was unfairly selected for enforcement out of a broader class of potential suspects.  In such cases, a comparison to similarly situated individuals may be fairly expected.  See, e.g., Bradley v. U.S., 299 F.3d 197 (3d Cir. 2002).  However, the "similarly situated" requirement is inapposite here, where an individual comes to the police with a criminal complaint and an officer allegedly disposes of the complaint in an adverse manner based (at least in part) on discriminatory motives.  This is not a case where the plaintiff alleges that he was treated differently than other similarly situated individuals.  Rather, the crux of Johnson's claim is that an official intentionally used his authority to treat him adversely on the basis of his race.

The police necessarily exercise much discretionary judgment in choosing how to respond to complaints by citizens, as Anhorn emphasizes.  (See Anhorn's Memo. of Law at 13-15.)  Given this fact, the reasoning of Arlington Heights is applicable to Johnson's claim.  As the Court notes: "[I]t is because [government officials] are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality.  But racial discrimination is not just another competing consideration.  When there is proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified." 429 U.S. at 265-66.  Although Arlington Heights concerned actions by legislators and administrators, not the police, the central holding nonetheless applies here – that the Fourteenth Amendment forbids state actors from exercising their discretion in an intentionally discriminatory manner.

conflict.  In response to Johnson's complaint, rather than offer protection,[27] Anhorn allegedly ordered Johnson not to return to the site, threatened him with arrest on various charges should he return, and otherwise treated him as a perpetrator, rather than a victim.

In order for a § 1983 plaintiff to survive a motion for summary judgment where intent is an element of his claim, the plaintiff must provide "affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive."  Crawford-El, 523 U.S. at 600.  In support of Johnson's claim of discriminatory intent, as noted previously in my discussion of Graham's claims, there are numerous pieces of evidence in the record of Anhorn's racially biased attitude towards African Americans in the Whitemarsh Township community and his racially motivated police practices generally.[28]  Considered in the light most favorable to Johnson, the evidence when taken together supports a reasonable inference that Anhorn's treatment of Johnson was impermissibly motivated by racial bias.  Thus, because a reasonable jury could find in Johnson's favor, Anhorn is not entitled to summary judgment as to Johnson's Equal Protection claim.

### b.        Qualified Immunity as to Johnson

Anhorn also claims qualified immunity from Johnson's Equal Protection claims.  Because Johnson has provided sufficient evidence for a reasonable jury to find an Equal Protection violation, Johnson has satisfied the first step of Saucier (the establishment of a constitutional

---

[27] Discriminatory denial of police protection may, in certain cases, give rise to an Equal Rights violation.  See Mody v. City of Hoboken, 959 F.2d 461, 466 (3d Cir. 1992); see generally Hynson v. City of Chester, 864 F.2d 1026 (3d Cir. 1988).

[28] (See, e.g., Power Point Presentation, Pls.' Resp. to Stemple, Ex. F at Power Point-00002, 5, 12, 13; Keystone Rep., Pls.' Resp. to Stemple, Ex. H at KIN-00008-15, 16-22.)

violation).   I now proceed to consider the second step of <u>Saucier</u>, whether the right in question (taking the facts in the light most favorable to Johnson) was clearly established at the time of Anhorn's conduct.

The right to be free from discriminatory law enforcement is clearly established.  "[A]ny 'systematic discrimination' in enforcement..., or 'unjust and illegal discrimination between persons in similar circumstances,'...violates the equal protection clause..."  <u>U.S. v. Berrigan</u>, 482 F.2d 171, 174 (3d Cir. 1973).  As the Third Circuit recently reiterated, "[I]t has long been a well-settled principle that the state may not selectively enforce the law against racial minorities."  <u>Gibson v. Superintendent of New Jersey Dep't of Law and Pub. Safety Div. of State Police</u>, 411 F.3d 427, 441 (3d Cir. 2005) (citing <u>Yick Wo v. Hopkins</u>, 118 U.S. 356, 373-74 (1886)).

Nonetheless, there may be some question as to how this right applies to the specific factual context of this case.  The relevant question is whether the "contours" of the right to Equal Protection are sufficiently clear that a reasonable official in Anhorn's position would understand that his actions (*i.e.*, twice ordering Johnson not to return to the gas station and threatening him with various charges should he ever return, allegedly on the basis of race) violates that right.  <u>See Anderson</u>, 483 U.S. at 640.  In order for the contours of the right to be clear, it is not necessary that "the very action in question has previously been held unlawful."  <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002).  Rather, "in the light of pre-existing law the unlawfulness must be apparent." <u>Id.</u> (internal citations omitted).  In other words, the state of the law must give defendants "fair warning that their alleged treatment...was unconstitutional."  <u>Id.</u> at 741.

In the instant case, there is no case law that is precisely factually analogous to Johnson's claim.  Nonetheless, it is a well-established principle under the Fourteenth Amendment of the

United States Constitution that state actors may not intentionally use their authority to treat members of a given race adversely out of racial bias or discriminatory motives.  See Arlington Heights, 429 U.S. at 266 n. 14 (1977) ("A single invidiously discriminatory governmental act in the exercise of the zoning power" would be unconstitutional); Memphis v. Greene, 451 U.S. 100, 119 (1981) (city's discretionary decision to close street would be unconstitutional if motivated by racial bias or discriminatory motive); Batson v. Kentucky, 476 U.S. 79 (1986) (although prosecutor has broad discretion to exercise peremptory strikes, Equal Protection Clause forbids prosecutor from striking potential jurors solely on account of race or on assumption that black jurors will be unable to be impartial towards a black defendant).  Surely, the fundamental nature of this principle is sufficient to give fair warning to police officers that they may not engage in adverse official conduct against a citizen based on bias or prejudice against members of that race.  Here, taking the facts in the light most favorable to Johnson, Anhorn invoked his authority as a police officer to prevent Johnson from undertaking lawful conduct and backed this order with threats of official sanctions, all on the basis of race.  Even though this may be a case of first impression on its facts, I encounter no difficulty in holding that the Fourteenth Amendment's guarantee of equal protection under the law prohibits such racially motivated conduct as a matter of clearly established law.

Thus, because the right in question is clearly established, Anhorn must also be denied qualified immunity as to the final plaintiff, Johnson.

### c. **Outstanding Issues of Fact Under Forbes**

The following facts are genuinely disputed and material to the issue of qualified immunity under Forbes, 313 F.3d at 146:

- Whether a motivating or determinative factor in Anhorn's treatment of Johnson was Johnson's race; and

- Facts relating to the substance and tenor of Anhorn's communications to Johnson, particularly whether he invoked his authority as a police officer to order Johnson not to return to the gas station and whether he threatened Johnson with arrest, which are relevant to whether Anhorn would have reasonably perceived that his conduct was adverse to Johnson.

### 5.    *The Plaintiffs' Section 1981, Section 1985, and State Law Claims*

Although Anhorn moved for summary judgment as to all claims, he failed to provide any indication in either his motion or his accompanying briefs as to why he believes there are no genuine issues of material fact as to Count II (42 U.S.C. § 1981), Count III (42 U.S.C. § 1985), or Counts V-X (state law claims).  Under Celotex, the party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  477 U.S. at 323.  Thus, although the moving party need not come forward with any affirmative evidence in their favor, they cannot meet their burden by merely stating that they are moving for summary judgment as to all counts without any further explanation.  As a result, I will deny summary judgment to Anhorn as to Count II (42 U.S.C. § 1981), Count III (42 U.S.C. § 1985), and Counts V-X (state law claims), without prejudice to raise in a motion in limine before trial.

**B.      The Individual Township Officials' Motion for Summary Judgment**

Against the individual Township officials, the plaintiffs bring Count XIV under 42 U.S.C. § 1986 and Count XV under 42 U.S.C. § 1988 (attorney's fees under fee-shifting statute).  The Township officials seek summary judgment and qualified immunity from all claims.

Although the Township officials stated that they are moving for summary judgment as to the plaintiffs' 42 U.S.C. § 1986 claim (Count XIV), they failed to provide any indication of why they believe there exists no genuine issue of material fact relevant to that claim.  In the plaintiffs' response to the Township officials' motion for summary judgment, they argued that liability should attach to the officials under § 1983 and made no argument relating to § 1986.  (See Pls.' Resp. to Township at 24-39.)  In their reply brief, the Township officials responded to the plaintiffs' § 1983 arguments,[29] but failed to present any discussion whatsoever relating to the law under § 1986.[30]   (See Township Reply at 52-60.)

Because the Township official defendants, the moving party, have failed to meet their burden of "identifying those portions [of the record]...which it believes demonstrate the absence of a genuine issue of material fact," Celotex, 477 U.S. at 323, I will deny summary judgment as to Count XIV, without prejudice to raise in a motion in limine before trial.

--------

**C.      Stemple's Motion for Summary Judgment**

--------

[29] Count IV of the complaints in the instant actions brings a § 1983 claim against Whitemarsh Township, but does not name the individual Township officials.

[30] 42 U.S.C. § 1986 provides a cause of action against any individual who, "knowing that a violation of section 1985 [prohibiting conspiracies to violate civil rights] is about to be committed and possessing power to prevent its occurrence, fails to take action to frustrate its execution."  Rogin v. Bensalem Township, 616 F.2d 680, 696 (3d Cir. 1980).

Against Stemple, the plaintiffs bring Count III under 42 U.S.C. § 1985 (alleging that Stemple conspired to violate their civil rights), Count V (alleging state law conspiracy), Count XI under 42 U.S.C. § 1983 (alleging supervisory liability for Anhorn's violations of the Fourth and Fourteenth Amendments), Count XII under 42 U.S.C. § 1981, Count XIII under 42 U.S.C. § 1983 (alleging violations by Stemple as Police Department policymaker), Count XIV under 42 U.S.C. § 1986, and Count XV under 42 U.S.C. § 1988.  Stemple does not claim qualified immunity, but argues that he is entitled to summary judgment as to all claims.

### 1.    *Section 1983 Claim*

The plaintiffs argue that Stemple's alleged failure to supervise Anhorn, particularly Stemple's alleged practice of condoning and promoting Anhorn's misconduct, renders Stemple liable under 42 U.S.C. § 1983.  In order to render a supervisor liable for the constitutional violations of a subordinate under 42 U.S.C. § 1983, a plaintiff must 1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that 2) the existing practice and procedure without the identified, absent one created an unreasonable risk of the ultimate injury, 3) the supervisor was aware that this unreasonable risk existed, 4) the supervisor was indifferent to the risk, and 5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice and procedure.  Brown v. Muhlenberg Township, 269 F.3d 205, 216 (3d Cir. 2001).

In support of their claims, the plaintiffs offer numerous pieces of evidence[31] that Stemple

---

[31] Stemple argues that the Keystone and MacMain Reports contain inadmissible hearsay and should be disregarded.  (Stemple makes no objection to the Power Point presentation of the police officers.)  But the plaintiffs need not produce evidence in a form admissible at trial in order to survive a motion for summary judgment.  Celotex, 477 U.S. at 324.  Because the Keystone and MacMain Reports contain statements made by police officers whom the plaintiffs

was aware of Anhorn's alleged racial profiling and illegal search and seizure practices, concealed officer complaints about those practices, discouraged officers from testifying as to Anhorn's alleged misconduct in the Township's investigations, failed to take any action to discipline Anhorn, and indicated to members of the Police Department that he would protect Anhorn from reprimands or sanctions.  (See McElree Dep., Township's Ex. N at 17-21 and 24-25; Keenan Dep., Pls.' Resp. to Township Ex. K at 108; Hale Rep., Pls.' Resp. to Stemple Ex. B at RMA-00009; Mar. 10, 2003 Letter, Pls.' Resp. to Stemple Ex. D; Power Point Presentation, Pls.' Resp. to Stemple Ex. F at Power Point-00001, 12, 18-19; Keystone Rep., Pls.' Resp. to Stemple Ex. H at KIN-00059-67.)

Taking this evidence in the light most favorable to the plaintiffs, a reasonable jury could find that the plaintiffs have satisfied the necessary elements under Muhlenberg Township.  First, the plaintiffs have identified a custom or procedure that Stemple failed to undertake (i.e., failure to reprimand or discipline).  Further, the plaintiffs' evidence, if believed, could establish that over a period of years prior to the plaintiffs' complaints, Stemple personally observed and received complaints of Anhorn's allegedly illegal, racially motivated police practices, and that Stemple actively promoted or condoned Anhorn's conduct before the other officers in the Department.   From this evidence, a reasonable jury could find that Stemple's actions created an "unreasonable risk" of illegal, racially motivated policing by Anhorn, thus satisfying the second

---

may call as witnesses at trial, their statements will be accepted in the form of the reports for the purposes of summary judgment.  This is not to hold that the reports themselves would be admissible at trial.  As Stemple points out, in order to be admissible in toto, the reports must fall within Federal Rule of Evidence 803(8)(C) (providing an exception to the hearsay rule for factual findings resulting from an investigation made pursuant to authority granted by law) or another hearsay exception.

Muhlenberg factor.  Based on the evidence that Stemple promoted or condoned Anhorn's conduct for a number of years, a reasonable jury could further find that Stemple was "aware" of and "indifferent" to the risk he was creating, thus satisfying the third and fourth factors under Muhlenberg Township.  Finally, the plaintiffs offer evidence to suggest that Anhorn was empowered by Stemple's failure to reprimand and his active condonation of Anhorn's conduct, thus satisfying the fifth factor (that the subordinate's violation resulted from the supervisor's failure to employ the necessary supervisory practice).  (See, e.g., Power Point Presentation, Pls.' Resp. to Stemple Ex. F at Power Point-0002 (Anhorn stating, "I am God around here and can do anything I want").)  Because the plaintiffs have offered sufficient evidence for a reasonable jury to find that supervisory liability may attach to Stemple under 42 U.S.C. § 1983, Stemple is not entitled to summary judgment.

## 2. *Section 1985, Section 1981, Section 1986, and State law Claims*

Although Stemple moved for summary judgment as to all claims, he failed to indicate in any way in his motion or accompanying briefs why he believes there is no genuine issue of material fact as to the plaintiffs' 42 U.S.C. §§ 1981, 1985, 1986, and state law conspiracy claims. Because Stemple, the moving party, has failed to identify the portions of the record demonstrating that there is no genuine issue of material fact, as required under Celotex, 477 U.S. at 323, I will deny summary judgment as to Count III (42 U.S.C. § 1985), Count V (alleging state law conspiracy), Count XII (42 U.S.C. § 1981), and Count XIV (42 U.S.C. § 1986), without prejudice to raise in a motion in limine before trial.

## D. The Township and Police Department's Motion for Summary Judgment

Against the Township and the Township Police Department, the plaintiffs bring Count IV under 42 U.S.C. § 1983 and Count XIV under 42 U.S.C. § 1986.

### 1. Section 1983 Claim

To establish municipal liability for a constitutional violation by a municipal official, a plaintiff must establish that the municipality engaged in a sufficiently long-standing policy or custom that was causally linked to the unconstitutional violation committed by the municipal official. See Monell v. New York Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Here, the plaintiffs allege that the Township and the Township Police Department engaged in a long-standing custom or policy of condoning or promoting Anhorn's illegal, racially motivated policing practices, a custom or policy that was causally connected to the constitutional violations they suffered.

In support of their claims against the Police Department, the plaintiffs offer evidence that former Chief Zolko and Stemple discouraged and/or retaliated against officers who submitted complaints about Anhorn, and that Stemple and former Chief Zolko acquiesced in, endorsed, and condoned Anhorn's alleged misconduct before the other officers. (See, e.g., McElree Dep., Township's Ex. N at 17-21 and 24-25; Keenan Dep., Pls.' Resp. to Township Ex. K at 108; Hale Rep., Pls.' Resp. to Stemple Ex. B at RMA-00009; Mar. 10, 2003 Letter, Pls.' Resp. to Stemple Ex. D; Power Point Presentation, Pls.' Resp. to Stemple Ex. F at Power Point-00001, 12, 18-19; Keystone Rep., Pls.' Resp. to Stemple Ex. H at KIN-00059-67.) If believed, this evidence would be sufficient to allow a reasonable jury to conclude that the Police Department (as represented by its policymakers Stemple and Zolko) had a policy or custom of supporting or condoning Anhorn's alleged misconduct, such that municipal liability could attach under Monell. Due to

these genuine disputes of material fact, the Township Police Department is not entitled to summary judgment.

Similarly, there are genuine issues of fact that are material to whether the Township engaged in a policy or custom of supporting or condoning Anhorn's conduct within the meaning of <u>Monell</u>.  These factual disputes include whether former Chief Zolko was a policymaker of the Township, whether Zolko acquiesced in, endorsed, or condoned Anhorn's misconduct, and whether the Township failed to train Anhorn to the extent of "deliberate indifference."  (<u>See</u>, <u>e.g.</u>, Hale Rep., Pls.' Resp. to Stemple Ex. B at RMA-00010; McElree Dep., Township's Ex. N at 17-21; Keenan Dep., Pls.' Resp. to Township Ex. K at 108.)  Because these facts, if resolved in the plaintiffs' favor, could be sufficient for a reasonable jury to find the Township liable under 42 U.S.C. § 1983, summary judgment must also be denied as to the Township.

### 2.   Section 1986 Claim

Although the Township and the Police Department moved for summary judgment as to all claims, they did not identify in their motion or accompanying briefs the portions of the record that demonstrate the absence of a genuine issue of material fact, as required under <u>Celotex</u>, 477 U.S. at 323.  As a result, I will deny summary judgment as to the plaintiffs' § 1986 claims under Count XIV, without prejudice to raise in a motion in limine before trial.

## IV.   CONCLUSION

Defendant Anhorn moves for summary judgment as to Counts I, II, III, V, VI, VII, VIII, IX, X, and XV of the above-captioned complaints on the basis of qualified immunity.  Plaintiffs Graham and Covington have demonstrated that there are disputed issues of material fact that

preclude a finding of immunity at this stage as to their claims under Count I (42 U.S.C. § 1983).

Plaintiffs Antonelli and Crumpton have demonstrated that there are disputed issues of material

fact that preclude a finding of immunity at this stage as to their Fourth Amendment claims

arising from the stop and the Affidavit of Probable cause and their Equal Protection claims under

Count I (42 U.S.C. § 1983).  But there are no outstanding issues of material fact relating to

Plaintiffs Antonelli's and Crumpton Fourth Amendment claims arising from the search under

Count I (42 U.S.C. § 1983).  Plaintiff Johnson failed to demonstrate that there are genuine issues

of material fact relating to his procedural due process claim in Count I (42 U.S.C. § 1983), but

has demonstrated that there are disputed issues of material fact relating to his Equal Protection

claim under Count I (42 U.S.C. § 1983).  Therefore, summary judgment is granted as to

defendant Anhorn as to Johnson's procedural due process claim and Antonelli's and Crumpton's

Fourth Amendment claims arising from the search in Count I (42 U.S.C. § 1983).  Summary

judgment is denied to Anhorn as to Count XV (42 U.S.C. § 1988 – attorney's fees and costs).

Summary judgment is denied to Anhorn without prejudice to raise in a motion in limine before

trial as to Count II (42 U.S.C. § 1981), Count III (42 U.S.C. § 1985), Count V (state law civil

conspiracy), Count VI (state law false imprisonment), Count VII (state law malicious

prosecution), Count VIII (state law abuse of process), Count IX (state law invasion of privacy),

and Count X (state law intentional infliction of emotional distress).

Defendant Stemple moves for summary judgment as to Counts III, V, XI, XII, XIII, XIV,

and XV.  Summary judgment is denied as to Count XI (42 U.S.C. § 1983 – supervisory liability),

Count XIII (42 U.S.C. § 1983 – liability as policymaker), and Count XV (42 U.S.C. § 1988 –

attorney's fees and costs), due to the existence of genuine disputes of material fact.  Summary

67

judgment is denied to Stemple without prejudice to raise in a motion in limine before trial as to Count III (42 U.S.C. § 1985 – conspiracy to interfere with civil rights), Count V (state law conspiracy), Count XII (42 U.S.C. § 1981 – equal rights under the law), and Count XIV (42 U.S.C. § 1986 – action for neglect to prevent).

The individual Township officials move for summary judgment as to Counts XIV (42 U.S.C. § 1986 – action for neglect to prevent) and XV (42 U.S.C. § 1988 – attorney's fees and costs).  Summary judgment is denied to the Township officials without prejudice to raise in a motion in limine before trial.

The Township and the Township Police Department move for summary judgment as to Counts IV and XIV.  Due to genuine issues of material fact, summary judgment is denied as to Count IV (42 U.S.C. § 1983 – Monell liability).  Summary judgment is denied without prejudice to raise in a motion in limine before trial as to Count XIV (42 U.S.C. § 1986 – action for neglect to prevent).

Copies **VIA ECF** on _____ to:                Copies **MAILED** on _____ to:

O:\ABB 2006\Antonelli sj opinion.wpd